# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 4, 2015                    Decided August 14, 2015

No. 13-3024
No. 13-3025
No. 13-3028

UNITED STATES OF AMERICA,
APPELLEE

v.

DAAIYAH PASHA, ALSO KNOWN AS MS. DEE,
IMAN PASHA, ALSO KNOWN AS KK,
CHARLES F. DAUM,
APPELLANTS

Appeals from the United States District Court
for the District of Columbia
(No. 1:11-cr-00102-2)
(No. 1:11-cr-00102-3)
(No. 1:11-cr-00102-1)

*Megan L. Rodgers* argued the cause for appellant Charles
F. Daum. With her on the briefs were *Seth A. Tucker*,
appointed by the court, and *Christopher P. Nofal*.

*Brian P. Morrissey, Jr.* argued the cause for appellant
Iman Pasha. With him on the briefs were *Jeffrey T. Green*,
appointed by the court, and *Benjamin B. Glerum*.

*K. Winn Allen* argued the cause for appellant Daaiyah Pasha. With him on the briefs was *Susan M. Davies*, appointed by the court.

*Kirby A. Heller*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee. *Elizabeth Trosman*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS, GRIFFITH and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: In multiple respects, these appeals concern the duties owed to the court by lawyers and their legal teams.

Appellants are a criminal defense attorney and two legal investigators who were convicted in 2012 of breaching those duties by fabricating evidence and suborning perjury during a 2008 trial in which they represented another individual as defendant. Such conduct tears at the fabric of our system of laws.

But these appeals challenge prosecutorial misconduct that is likewise inimical to justice. Specifically, two Appellants argue for reversal of their convictions based on the Government's undisputed breach of its obligation to timely turn over exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963). We agree with Appellant Daaiyah Pasha that but for the *Brady* deficiency, there is a reasonable probability of a different outcome in her case. We therefore direct a new trial for Daaiyah Pasha, with appropriate remedies to cure the damage caused by the Government's delayed disclosure.

We do not, however, agree with Appellants Charles Daum and Iman Pasha on the challenges they raise, and so we affirm their convictions.

**I.**

In April 2008, Appellant Charles Daum was retained as defense counsel by Delante White, who had been indicted on cocaine distribution charges. In September 2008, Daum represented White at a trial in the United States District Court for the District of Columbia that resulted in a hung jury. Daum was assisted in this representation by Appellants Iman Pasha and Daaiyah Pasha as non-attorney investigators.[1] Daaiyah, a woman now in her early sixties, is Iman's mother.

In January 2009, the district court hearing the case against White granted Daum's motion to withdraw as counsel based on threats made by White against Daum. A superseding indictment added new defendants and new charges, and White and others subsequently pled guilty to the cocaine-related charges and to witness tampering and obstruction of an official proceeding in connection with the original trial.

Following a two-year investigation, the Government charged Daum, Iman, and Daaiyah with conspiracy to obstruct justice; Daum alone was also charged with witness tampering, fabricating evidence, and suborning perjury in the 2008 trial. The factual crux of the allegation was that Appellants had staged a photo shoot a few weeks before the trial to support a defense that key evidence attributed to Delante White actually belonged to his brother Jerome White.

---

[1] We will refer to Iman and Daaiyah Pasha by their first names in this opinion in order to distinguish them from each other.

The Government alleged that Daum had masterminded the scheme and that Iman and Daaiyah had carried out the photo shoot on September 12, 2008, in the home of Cheryl White, who is the mother of Delante White and his siblings Jerome and Christopher. In its findings of fact, the District Court explained the photo shoot scheme as follows:

> In preparation for Delante's trial, Daum developed a plan to prove to a jury Delante's claim that the drugs found at his grandmother's – Evelyn Clowney's – house belonged to his younger brother Jerome. In order to carry out this plan, Daum entered into a conspiracy in which he directed, in various ways, Daaiyah and Iman Pasha and Jerome and [Delante White's girlfriend] Candice to set up a photo shoot to take pictures that showed Jerome cutting up what appeared to be crack cocaine with what appeared to be the items recovered from Evelyn Clowney's apartment in plain view. The purpose of these staged photographs was to introduce them as evidence at Delante's trial in an effort to make the jury think that all of the items found at Evelyn Clowney's apartment, including the cocaine, actually belonged to Jerome. Daum assured Jerome, Christopher, and Candice, that they would not get in trouble for this plan, and were protected under a legal theory called "double jeopardy."

Both of the substantial legal issues raised in these appeals arise from a pretrial motions hearing that took place on April 19, 2012, and was attended by all Defendants and their counsel. At the outset of that hearing, the District Judge announced that she would address two motions and discuss trial procedures for an expected trial start a week and a half later.

Before the Judge began to speak to those points, however, Daaiyah's lawyer informed the District Court that the three Defendants were waiving their rights to jury trial and requesting the Government's consent to try the case to the District Court. He explained that Defendants were only telling the District Court at such a late juncture because "this was a decision that was back and forth from last month." Daum's counsel added a similar statement, saying that "the decision was made recently with very fulsome discussions between the defense lawyers and their clients." He also represented that the Government had not previously been informed of the waiver offer and that "obviously we would expect that they might need some time before they can respond." The Judge noted that the Government was likely as surprised by the offer as she was, telling the Assistant U.S. Attorney: "It took me back. It will take you back I assume." And the Judge allowed the Government some time to decide whether to accept the offer of jury trial waiver. The Judge then proceeded to describe jury selection plans in case the waiver offer was not accepted.

On April 24, 2012, the Government filed a written acceptance of Defendants' offer to waive jury trial. On April 25, Defendants filed three waivers of trial by jury, one executed by each Defendant.

The April 19 hearing also addressed a motion by Daaiyah's lawyer to compel production of *Brady* material. More than eight months earlier, on July 11, 2011, the Government had interviewed Everett Montgomery, the boyfriend of Cheryl White (at whose home the photo shoot was staged). Montgomery said that on the day of the photo shoot, he was present and saw a man and a woman in her mid-thirties enter the apartment carrying balloons, which were a key prop featured in the fabricated photos taken that evening.

The Government did not disclose Montgomery's statements to the defense until April 5, 2012, over eight months after the interview and just a few weeks before the trial. The Assistant U.S. Attorney trying the case, who had been present personally at the 2011 interview, acknowledged to the District Court that he had violated Department of Justice policy to provide *Brady* information as soon as he became aware of it. He also reported that the Government had recently re-interviewed Montgomery, who had changed his story and now said that instead of one man and one woman, he had observed two women come into his apartment on the relevant evening.

To clarify the critical timeline: The Government's original interview with Montgomery took place on July 11, 2011. On April 5, 2012, the Government disclosed Montgomery's exculpatory statement to defense counsel. Daaiyah's lawyer told the District Court that this caused him to "stop[] trial preparation and spen[d] the next five days trying to locate Mr. Montgomery," at which time (that is, on April 10, 2012) Montgomery told the defense team that he had seen a man and a woman enter his apartment on September 12, 2008, the night of the photo shoot. On April 11, 2012, the day after defense counsel had first interviewed Montgomery, prosecutors met with Montgomery at the U.S. Attorney's office. They reported that at that meeting Montgomery said he saw "two women enter his apartment, both of whom were in their thirties or forties." On April 16, 2012 – three days before the key pretrial hearing described above – defense counsel again met with Montgomery, who "reaffirmed that he saw a man and a woman enter his apartment on September 12, 2008."

After hearing argument at the pretrial hearing, the District Court announced that "there is not the slightest doubt that the

Government committed a *Brady* violation." It also concluded that there was "very real prejudice" because memories fade in eight months and the defense had lost the opportunity to get a fresher recollection on the record. And it invited Defendants to submit requests for sanctions.

On April 30, 2012, Defendants filed a written motion to dismiss the indictment or, in the alternative, to preclude the Government from introducing any testimony regarding events at the photo shoot. The District Court held an on-the-record phone conference the next morning, on May 1, 2012, and told the parties that "a final decision on these motions can occur certainly after trial, given what the defense is requesting in terms of its motion." The Court accordingly reserved judgment on sanctions, ordering the Government to respond in writing within 15 days after rendering of a verdict.

A month-long bench trial began on May 7, 2012. The principal evidence presented regarding the participation of Iman and Daaiyah in the photo shoot included:

- Testimony by Delante White's girlfriend, Candice Robertson, that both Iman and Daaiyah were present. She testified that Iman "took [most] of the pictures and [Daaiyah] staged the scene." She also testified that both Iman and Daaiyah had been present at a meeting in Daum's office earlier in the day to plan the photo shoot. And she testified that she had paid Iman $200 for the photo shoot and $50 to have the photos developed without date stamps.

- Testimony by Delante White's brother, Jerome White, that both Iman and Daaiyah were present at the photo shoot.

- Testimony by Jerome White's girlfriend, Brittany McDaniels, that she had witnessed two female investigators arriving at the photo shoot, but that Daaiyah was not one of those women.

Defendants subpoenaed Montgomery to testify at trial, and he complied and appeared in the courthouse ready to be called. Defendants asked the District Court mid-trial to preclude the Government from cross-examining Montgomery as a *Brady* sanction, and the District Court denied the request. Indeed, the District Court rejected the proposal out of hand, stating: "[T]here's absolutely no case law supporting such a drastic, draconian way of dealing with the problem in mitigating any prejudice."

After this ruling, the defense did not call Montgomery. The trial concluded, and on June 22, 2012, the District Court announced and filed its verdict, finding Defendants guilty on all counts except one (Daum was found not guilty of Count V, tampering with a witness).

Pursuant to the District Court's pretrial order, the Government responded post-verdict to the Pasha Defendants' written motion to dismiss the indictment as a *Brady* sanction. In an Order dated August 20, 2012, the District Court denied the motion as a result of finding no prejudice caused by the Government's *Brady* failure. The District Court explained: "Having heard all the evidence in this case, the Court now concludes that the Defendants cannot meet their burden of showing a reasonable probability of a different outcome."

The District Court sentenced Defendants on March 12, 2013, to 63 months imprisonment (Daum), three years of

probation (Iman), and three months of imprisonment (Daaiyah).[2] Each Defendant filed a timely notice of appeal.

## II.

We first analyze challenges raised by each Appellant to the validity of his or her waiver of right to trial by jury. Then, we turn to challenges raised by Daum to the District Court's construction of the offenses. Finally, we examine the *Brady* failures that create the most difficult issues in this appeal.

## A.

Appellants contend – for different reasons – that their waivers of right to jury trial were ineffective. Our precedents clearly identify the test – sufficient basis – for determining whether a district court's acceptance of a jury trial waiver in the first instance was in error. *United States v. David*, 511 F.2d 355, 362-63 (D.C. Cir. 1975). That is, we ask whether or not the district court had sufficient basis for determining the validity of each waiver, *id.*, and we think this District Court had sufficient basis in each instance here. As to challenges to the validity of jury trial waivers based on later-raised evidence, none of the Appellants has alleged or presented adequate evidence of harm.[3]

---

[2] The Government notes that Iman's probation was subsequently revoked, and the District Court remanded her to one year imprisonment.

[3] The parties sharply dispute whether a jury trial waiver challenge not raised in the district court is subject to de novo or plain error review. We need not resolve that issue here because Defendants' challenges are so plainly lacking in merit that they would fail no matter the standard we apply. We also note that the key cases cited by the Government for the proposition that challenges to the validity of a jury trial waiver should be reviewed for plain error

As a starting point on the proceedings in this case, we observe there is no dispute that each waiver complied with all requirements of Rule 23(a), that is: (1) the Defendants waived jury trial in writing; (2) the Government consented; and (3) the court approved. *See* FED. R. CRIM. P. 23(a). Appellants can claim no violation of the rules, and they argue instead that their Due Process rights have been violated.

To support their claims, Appellants point to the Benchbook for U.S. District Court Judges, which recommends that judges always conduct an oral colloquy and provides suggested questions for use in doing so. *See* FEDERAL JUDICIAL CENTER, BENCHBOOK FOR U.S. DISTRICT COURT JUDGES 33-35 (6th ed. 2013). But the Benchbook is merely a training manual and compendium of advice, and it is neither binding nor itself a statement of judicial policy. *Id.* at ii; *see also United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005) (explaining that although the Benchbook provides a guide to questions at a colloquy, it is not a "sacrosanct litany"). To be sure, the Benchbook captures the best practice on this issue. As we said in *David*, "many courts – including our own – have indicated that trial judges would be well-advised to directly question the defendant in all cases to determine the validity of any proffered waiver of jury trial." 511 F.2d at 361.

Best practice notwithstanding, this District Court had the sufficient basis we must look for under *David* in reviewing

---

deal with claims that Rule 23(a) was violated, not that a defendant's underlying constitutional right was violated. *See United States v. Williams*, 559 F.3d 607, 610 (7th Cir. 2009) (stating that "lack of a written waiver by Williams was a violation of Rule 23(a)"); *United States v. Carmenate*, 544 F.3d 105, 108 (2d Cir. 2008) ("[T]he defendant failed to sign a written waiver pursuant to Rule 23(a)(1) of the Federal Rules of Criminal Procedure.").

each determination that a waiver was valid. *See id.* at 362. With all attorneys and Defendants present, experienced defense counsel represented that the waiver decisions had been reached after "very fulsome discussions between the defense lawyers and their clients" that had been "back and forth from last month." The written waivers were substantive and addressed most of the issues recommended by the Benchbook, well beyond what is required by Rule 23(a)(1).[4]

---

[4] Daum's jury waiver stated:

Defendant Charles Daum, through counsel, respectfully informs this Court that pursuant to Fed. R. Crim. P. 23 he wishes to waive his right to a trial by jury in this matter and wishes to have this case tried to the Court.

Mr. Daum understands that he has by Court Rule and by the United States Constitution the right to have the case decided by 12 jurors. He further understands that he would be permitted to participate in the jury selection process with his counsel. He further understands that for good cause his counsel could argue that prospective jurors who do not demonstrate impartiality after questioning by the Court could be excused by the Court. Additionally, Mr. Daum understands that based on FED. R. CRIM. P. 24 he would be able to exercise through his own counsel and counsel for the co-defendants ten peremptory challenges, which is his right, to strike any juror for any reason other than those not permitted by the court. Mr. Daum further understands that after the jury is selected the jurors would be instructed by the court to base their decision on the evidence in the case with regard to only his culpability. Additionally, the jury would be instructed that any verdict on any count with regards to any defendant must be unanimous.

Knowing all this and after full discussion with his counsel he knowingly and voluntarily waives his right to a jury trial in the above captioned case and desires to be tried by the court.

I have read and consent to the above, [signed] Charles Daum.

Daaiyah and Iman simultaneously submitted materially identical waivers.

Although we reaffirm that conducting a colloquy on jury trial waiver is always well advised, a colloquy was not necessary to comply with Rule 23(a) in these circumstances.

To satisfy Due Process, a defendant waiving the right to trial by jury must do so knowingly and intelligently. *David*, 511 F.2d at 361; *see also Carmenate*, 544 F.3d at 108 (stating that what "the Constitution requires is that a waiver of the right to a jury trial be knowing, voluntary, and intelligent"). Although a Rule 23(a)(1) written waiver is not conclusive proof that this requirement has been satisfied, we have treated it as at least a rebuttable presumption. *Compare United States v. Lawson*, 682 F.2d 1012, 1016 (D.C. Cir. 1982) (dismissing attack on the validity of jury trial waiver based on conformance with Rule 23(a)(1)), *with David*, 511 F.2d at 361 (holding that Rule 23(a) written waiver is inadequate "where circumstances cast doubt on the validity of a given waiver"). None of the Appellants successfully rebuts the presumption.

Daum contends that medical issues contained in his presentence report, a document prepared only after the trial, create the same kind of special circumstance defeating the presumption as we found in *David*, where the defendant's counsel expressed serious misgivings at the outset about his client's competency to stand trial and the district court had before it conflicting reports from psychiatrists on that point. *See* 511 F.2d at 358. But as Daum's counsel repeatedly acknowledged at argument before us, there was nothing in the record indicating any issue at the time the District Court accepted his waiver. Here, Daum himself was an experienced defense lawyer, represented by another experienced defense lawyer, who submitted a detailed waiver statement well beyond that required by the rule. Under these circumstances,

we cannot find that the District Court lacked "sufficient basis" to accept the waiver.[5]

Iman and Daaiyah have somewhat better arguments, contending that the multi-defendant context creates a *David* circumstance that requires a colloquy.[6] They tell us that the District Court had an obligation to assess whether each Defendant understood that she could not be outvoted by her co-Defendants. And they would have us decide that the multi-defendant context always requires an oral colloquy. *Cf. United States v. Duarte-Higareda*, 113 F.3d 1000, 1003 (9th Cir. 1997) (requiring oral colloquy on jury trial waiver for any defendant who has used a language interpreter yet submits a written waiver only in English).

Although we agree that the multi-defendant context calls for yet stronger urging that district courts conduct an oral colloquy on jury waivers in every case, we disagree that a per se rule is required. Neither Iman nor Daaiyah has asserted

---

[5] Daum seeks to draw on medical issues discussed in his presentence report and on a prescription medication label submitted as a sealed attachment to his reply brief in this appeal. Even assuming there is a circumstance in which later-created records could vitiate a jury waiver that a district court had substantial basis for accepting at the time of submission, we need not decide the question in this case because Daum has not alleged that his waiver was not *in fact* knowing and voluntary, nor has he pointed to enough evidence to overcome the presumption created by his written waiver that it was.

[6] Iman raises the additional arguments that her attorney, although present, did not speak at the hearing in which counsel for co-Defendants made representations on her behalf, and also that her written waiver was electronically filed by counsel for a co-Defendant. Where, as here, there has been no suggestion that a defendant's lawyer was deficient in any way, we decline to read anything into either of these facts of the proceeding.

that an oral colloquy would have made a difference to her waiver decision. Neither Iman nor Daaiyah has even argued that she in fact lacked understanding of her right to jury trial or that but for the trial court's failure to ensure she had that understanding there is a reasonable probability she would not have waived the right.

In sum, Appellants have not submitted persuasive evidence that any of them lacked ability to consent, lacked actual consent, or would have made a different decision on whether to waive the right to jury trial if there had been an oral colloquy. Absent such evidence or allegations and given that the procedure used by the District Court complied with Rule 23(a), it is an inescapable conclusion that Appellants are merely seeking a second bite at the trial apple. We see no basis in this issue for granting one.

**B.**

Daum next asks us to reverse certain convictions based on what he claims were two legal errors by the District Court in construing the scienter requirements of the charges against him. He hinges these challenges on a statement by the District Court that "we do not know what Defendant Daum's motive could have been." In the context of the opinion, this is a comment on the expressly-asked rhetorical question of "why in the world would an experienced, long-time defense attorney engage in such nefarious conduct?" The District Court explained that the question applied with even greater force because this was a representation for which Daum had charged a "paltry $12,000" for trial and retrial. Daum now argues this reflects a failure by the District Court to find: (1) corrupt motive required on the obstruction of justice charge, and (2) willfulness required on the subornation of perjury charge. These arguments conflate the abstract question of

"why the defendant did it" with the specific intent requirements of the charges in this case.

Given that Daum did not object on these issues below, we examine them only for plain error. *See United States v. Purvis*, 706 F.3d 520, 522 (D.C. Cir. 2013). Daum has failed to identify any plain error here.

First, Daum challenges his conviction for obstruction of justice on the basis that the District Court erred in concluding that motive is not an element of the crime.[7] The statute prohibits "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503. Daum contends that "corruptly" means having a "corrupt motive," and that as a factual matter he lacked one because he was motivated by fear of his client. Daum points to *United States v. Haldeman* to support his theory, but that case simply explained that "corruptly" meant having an evil purpose or intent. 559 F.2d 31, 115 n.229 (D.C. Cir. 1976) (en banc) (per curiam). In *Haldeman*, we upheld a ruling that the jury had to be convinced the relevant defendant "made some effort to impede or obstruct" the Watergate investigation or the resulting trial. *Id. Haldeman* does not, however, support the notion that special consideration is due a defendant "whose hope is to avoid obstructing justice while the natural consequence of success in his endeavor would be to achieve precisely the opposite result." *United States v. Neiswender*, 590 F.2d 1269, 1273 (4th Cir. 1979). Instead, "the defendant need only have had knowledge or notice that success in his fraud would have likely resulted in an obstruction of justice." *Id.*; *see also United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990), *opinion withdrawn and superseded in other part on reh'g*, 920 F.2d 940 (D.C. Cir.

---

[7] Iman joined this argument without elaboration in her brief.

1990) (explaining that a person acts "corruptly" when taking action with "'the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others'") (quoting BALLENTINE'S LAW DICTIONARY 276 (3d ed. 1969) (alteration in original). The District Court found that Daum developed and directed a scheme to defraud a federal criminal trial. It was not plain error to conclude that this satisfied the statutory requirement that he acted "corruptly."

Daum also challenges his two subornation of perjury convictions on the basis that the District Court omitted a required element of "willfulness." The statute defining the crime states: "Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1622. Daum argues that the statute incorporates a willfulness requirement and that "willfulness" in this context should mean "voluntary, intentional violation of a known legal duty." *See Cheek v. United States*, 498 U.S. 192, 200 (1991) (quoting *United States v. Bishop,* 412 U.S. 346, 360 (1973)). The Government responds that *Cheek* applies only to "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct," *Bryan v. United States*, 524 U.S. 184, 194 (1998), and so Daum's reliance on it is misplaced. As the Government notes, however, the District Court made findings of fact that would satisfy even the *Cheek* standard of requisite intent. Among findings relevant to this Count (Count VI) was that Daum "instructed Christopher White to perjure himself and say that he took the photos." Given Daum's experience and role as a criminal defense attorney, this finding suffices – particularly under the plain error standard – to support a conclusion that Daum meant for White to break the law.

Daum tells us reversal of his convictions is further warranted because "there is substantial evidence that [he] was under duress, or in fear for his safety, because on at least one occasion before the trial began, Delante White threatened [Daum's] life if he did not win an acquittal." As we understand it, Daum would have us read this into his element-of-the-offense arguments in a manner that puts the burden of proof on the Government to show that Daum was not acting under duress. But duress is an affirmative defense, and it is a defendant's burden to demonstrate it at trial. *See Dixon v. United States*, 548 U.S. 1, 17 (2006); *United States v. Nwoye*, 663 F.3d 460, 462 (D.C. Cir. 2011); Model Penal Code § 2.09. Daum did not attempt to present a duress claim before the District Court and now has cited nothing in the record showing that he drew the District Court's attention to Delante White's alleged threat. There was therefore no plain error in the lack of consideration the District Court gave to such evidence.

## C.

Finally, we turn to Iman's and Daaiyah's contentions that they were prejudiced by the Government's failure to timely turn over exculpatory evidence. A *Brady* violation has three components: "[1] The evidence at issue must be favorable to the accused . . . ; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008).

The first two components of a *Brady* violation are certainly present here. A prosecutor in this case was personally present at an interview in which a witness gave a scene-of-the-crime account that, if credited, would contradict

the identity of at least one of the Pasha Defendants in this case. The prosecutor waited over eight months until the eve of trial to reveal this information. As the District Court explained, this delay was inexcusable: At the moment the eyewitness said the two individuals who arrived at the photo shoot were a man and a woman (rather than two women), "counsel for the Government should have understood that as soon as they were finished talking with that gentleman, they had an obligation to give that information to the defense."[8]

So the question we must resolve regards the third component of a *Brady* violation: that is, whether any Defendant was prejudiced by the Government's failure to comply with its duty. We must answer in the affirmative if we find "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (internal quotation mark omitted). "The defendant bears the burden of showing a reasonable probability of a different outcome." *Johnson*, 519 U.S. at 488. But a reasonable probability does not require a showing that it is more likely than not that the defendant would have been acquitted had the evidence been disclosed. *United States v. Johnson*, 592 F.3d 164, 170 (D.C. Cir. 2010). Instead, "[a] 'probability' reaches the level of 'reasonable' when it is high enough to 'undermine confidence

---

[8] The District Court denied as moot a separate sanctions motion related to a would-be *Brady* violation in connection with the count on which Daum was found not guilty. J.A. 98. Referencing that failure to comply with *Brady* obligations had more than once been a problem in this case, the District Court chastised the prosecutors with respect to the failure to turn over the exculpatory evidence at issue in this appeal: "What is particularly troubling is that this is the second time in this case that the Government has withheld significant *Brady* information for an extended period of time. When is the Government going to learn?"

in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

**1.**

We review *de novo* the prejudice determination made by the District Court, considering directly "any adverse effect that the prosecutor's failure . . . might have had on the preparation or presentation of the defendant's case." *United States v. Bagley*, 473 U.S. 667, 683 (1985); *see also In re Sealed Case No. 99-3096*, 185 F.3d 887, 892 (D.C. Cir. 1999). This remains true even where, as here, the factfinder was the judge who made the original prejudice determination. *See Bagley*, 473 U.S. at 672 (noting that the original proceeding was bench trial).

Not surprisingly, the Government urges deference to the District Court's finding of non-prejudice. It cites our observation in a prior case that "[t]he district judge is, of course, best suited to evaluate the significance of the undisclosed material." *United States v. Jenrette*, 744 F.2d 817, 825 (D.C. Cir. 1984). The Government reasons that this analysis applies with even greater force in a bench trial where the District Court is uniquely positioned to determine the effect of particular evidence on its own verdict. To the extent *Jenrette*'s observation survives the Supreme Court's decision in *Bagley*, however, it does not factor in our analysis here. The District Court noted that it would have reached a guilty verdict as to each of Iman and Daaiyah based on "all the other evidence upon which the Court relied in its final verdict." But our role is not to conduct "a sufficiency of the evidence test," asking whether the District Court's conclusion about a hypothetical trial absent the Government's *Brady* omission was supportable. *See Kyles*, 514 U.S. at 434 ("*Bagley* materiality . . . is not a sufficiency of evidence test.").

Instead, we ask whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" for a generic factfinder who has not already reached a determination of guilt beyond a reasonable doubt, accounting for how the defense may have changed its preparation or presentation if the exculpatory material had been disclosed in a timely manner. *Bagley*, 473 U.S. at 682.

**2.**

It is uncontested here that the photo shoot to fabricate evidence for Delante White's trial took place on September 12, 2008, at the home of Delante White's mother, Cheryl White. The direct evidence of Iman's and Daaiyah's involvement in the criminal events that evening is, however, limited. In short, two participants in the photo shoot placed both Iman and Daaiyah at the scene while a third said that although two women working as investigators for Daum had been present, Daaiyah was not one of them. All of the eyewitnesses had grave credibility problems.

Candice Robertson, Delante White's girlfriend, testified that Iman "took [most] of the pictures and [Daaiyah] staged the scene." The District Court found, however, that Robertson "was a total disaster as a witness" who "could not give a straight answer to any question; . . . could not give the same answer to any question when that question was asked more than once; . . . [and] changed her testimony so many times about so many things that it was almost sad to watch her." She also received a favorable plea bargain for her testimony in this case.

Jerome White, Delante White's brother, testified that both Iman and Daaiyah were present at the photo shoot. The

District Court found, however, that Jerome White "was a hesitant, reluctant witness, who was not at all forthcoming in his responses to questions" and that "[t]here were times he seemed barely awake on the stand and . . . could not keep his eyes open." He testified that "he lived his life in order to stay high 24 hours a day" on drugs and alcohol and that "because of the enormous amount of marijuana he had smoked, his long-term memory was not good." He, too, received a favorable plea bargain for his testimony in this case.

Brittany McDaniels, Jerome White's girlfriend, testified that although she had seen two women arrive at the photo shoot whom she took to be Daum's investigators, Daaiyah was not one of those women. McDaniels was given a no-prosecution agreement in exchange for her testimony.

This is not much in the way of direct evidence.[9] Had Everett Montgomery testified along the lines of his initial

---

[9] Although the evidence was not overwhelming, particularly against Daaiyah, it was still well clear of the bar for the sufficiency of evidence challenge that Iman and Daaiyah raise as an alternative basis for vacating their convictions. The standard for such challenges is very high. *See United States v. Mellen*, 393 F.3d 175, 180-81 (D.C. Cir. 2004) (stating that on appeal for sufficiency of the evidence, all evidence is reviewed in light most favorable to the Government and the conviction must be affirmed if any rational trier of fact could have found guilt beyond a reasonable doubt). "[F]ull play" is due the factfinder in determining credibility, weighing evidence, and drawing justifiable inferences. *United States v. Hall*, 613 F.3d 249, 252 (D.C. Cir. 2010). Iman and Daaiyah have "not establish[ed] that it was implausible for the district court to credit particular . . . testimony," *United States v. Jones*, 744 F.3d 1362, 1367 (D.C. Cir.), *cert. denied* 135 S. Ct. 8 (2014), given that other evidence supported their convictions. To the extent Daaiyah distinguishes *Jones* on the ground that the inability of Jerome and Candice "to tell a consistent story about

interview, the scorecard would have been two eyewitnesses who placed Daaiyah at the scene and two eyewitnesses whose testimony excluded her. The math would be less favorable for Iman, because Brittany McDaniels did not rule out her participation and because it is more likely that a factfinder could think Montgomery's original description of a man and a woman in her mid-thirties to mid-forties might include Iman.[10] The District Court did note that had Montgomery testified, he likely would have had credibility problems, as "a number of witnesses testified to the fact that Mr. Montgomery was very inebriated at the time of the photo staging, . . . that he stayed in his bedroom most of the time, and that he slept during much of the time." But even assuming that we may consider those factors without knowing what Montgomery himself would have said about them, it takes no stretch of the imagination to think Montgomery might have been at least as credible to a reasonable factfinder as the District Court found Candice Robertson to be – that is, barely credible at all.

The Government also argues that Montgomery's memory was not fresh when the prosecution originally interviewed him in July 2011, nearly three years after the night of the photo shoot, and that the additional eight-month delay before the defense was notified of his initial statement could not have

---

Daaiyah's supposed participation in the photo shoot goes directly to Daaiyah's conviction, not to their general credibility," Reply Br. 5, this ignores other evidence on which the District Court properly relied, which, as noted, did not need to be overwhelming.

[10] Although the parties did not clearly indicate the age of either Iman or Daaiyah, the district court records indicate that Iman was 29 years old and Daaiyah was 58 years old at the time of the photo shoot in September 2008. We note also the District Court's apparent conclusion at the April 19 pretrial conference that whatever Montgomery's original description was, it was not categorically inconsistent with Iman's appearance.

made much difference.  It contends that the best framework for thinking about possible prejudice is whether the difference between an interview thirty-six months after the photo shoot and forty-five months after the photo shoot could have mattered.

We disagree with the Government's proposed analysis for two reasons.  First, because Montgomery himself said the additional time lapse made a difference.  Defendants submitted a declaration from him stating: "If you talked to me last year I would have been able to tell you more."  Second, both Daaiyah's trial counsel and the District Court explained just what a difference the delay might have made.  Daaiyah's counsel told the District Court:

> Had I known [at the time the Government initially interviewed Montgomery], I would have [gone] to this person.  I wouldn't have taken a statement from him.  I would have gotten a Court Reporter and got it under oath.  That's how critical this person is to my case.  So when this person comes to testify and the Government cross-examines him and says, didn't you say X, I can rehabilitate him with sworn testimony which goes to the jury, as the Court knows, under the rules not as a prior consistent statement that we rehabilitated him for impeachment purposes, but it goes to the jury as substantive evidence for the truth because I had it under oath and it is the truth of it . . . .

The District Court evidently agreed:

> [T]he prejudice here was very substantial.  If defense counsel had been able [] to get to Mr. Montgomery, and I have a feeling with that kind of an exculpatory statement they would have done their best to get to him as fast as

possible, then at that point, they could have followed up with Mr. Montgomery. They could certainly have gotten a written statement from him, and they certainly if they wanted to could have gotten a statement under oath from him and if that statement was not favorable, too bad for the defense.

The great difficulty, as the District Court noted, is that "[w]e will never know whether that statement would have been favorable or unfavorable." But because it was the Government that failed to comply with its *Brady* obligations, this uncertainty must be charged to the Government's case.

All this plays out differently as to the two Appellants raising the *Brady* claim.

First, as to Iman: It is doubtful just how exculpatory Montgomery's hypothetical testimony could have been for her (that is, the testimony Montgomery would have given absent the time lapse caused by the *Brady* failure). If credited, Montgomery's original statement about seeing a man and a woman in her mid-thirties arrive at the photo shoot would defeat the Government's narrative that Iman arrived with her mother, Daaiyah, but it does not clearly exclude Iman as being the woman Montgomery saw. Even treating Montgomery's original statement as somewhat exculpatory of Iman, there was no other evidence that she did not participate in the photo shoot (unlike for Daaiyah, whom Brittany McDaniels testified was not there). Beyond the eyewitness testimony from the night of the photo shoot, the Government's case included substantial other inculpatory evidence against Iman. Credible witnesses testified that Iman was Daum's investigator working on Delante White's case at the time of the photo shoot, and phone calls between Delante White and co-conspirators discussed Daum's investigators

being at the shoot. Tiffany Archer, another investigator who worked with the Pashas, testified that she and Iman went to Candice Robertson's apartment on April 14, 2009 – ostensibly to search for perishables, but actually to give Iman time to search the apartment. Candice Robertson's mother testified that on the same date (April 14, 2009), Iman called her and said she was "looking for Candice's black bag." She also testified that sometime later, Iman brought her a money order for $300 "to help Candice out" and that Iman visited a third time and told her she had sent Candice a $200 money order. The District Court noted that this testimony was "confirmed by documentary evidence of checks and money orders" and Iman's actions "cannot be explained by any reason other than that they were a cover-up." All this is enough to show that Iman Pasha was actively involved in Delante White's case and to provide a good deal of evidentiary support for her involvement in the obstruction of justice conspiracy.

But the calculus is different as to Daaiyah because there is more exculpatory evidence and substantially less inculpatory evidence than for Iman. Defendants themselves seem to have collectively recognized this, submitting in their joint brief to the District Court that the prejudice "is particularly damning to defendant Daaiyah Pasha." Indeed, we agree that Daaiyah has made out a *Brady* claim. Two witnesses with credibility issues (Candice Robertson and Jerome White) testified that she was at the photo shoot, but a third (Brittany McDaniels) testified that she definitely was not. Testimony from Montgomery along the lines of his initial statement would have made the eyewitness scorecard two against two as to whether Daaiyah participated in the photo shoot – even as we note that while the accounts of both McDaniels and Montgomery exclude Daaiyah's participation, they are in tension with each other. Moreover, although

Daaiyah frequently worked as an investigator for Daum, it is not even clearly established in the record that she had a substantial role as his investigator on this case, much less that her participation was anywhere near as extensive as Iman's.

There is some testimony about Daaiyah having been present at certain meetings. Candice Robertson and Jerome White placed Daaiyah at a planning meeting in Daum's office the morning of the photo shoot. But their recollections of that meeting were inconsistent, and Jerome did not remember if Daaiyah was actually in the room during the meeting or elsewhere in Daum's office. Christopher White, who was involved in the broader obstruction of justice but was not present at the photo shoot, placed Daaiyah at a different meeting in which Daum instructed him to perjure his testimony. The District Court found Christopher White the most credible of the four core witnesses. Importantly, however, the District Court's verdict did not make any explicit findings regarding Daaiyah's presence at these two meetings, and so we cannot be sure whether it credited the relevant claims. But evidence regarding Daaiyah's presence at meetings, even if such meetings were proven to have taken place, does not meaningfully corroborate the testimony that she participated in the photo shoot. Nor does this weak evidence counter the reasonable probability that, in light of Montgomery's statement, a factfinder could have reasonable doubt as to her knowing participation in the conspiracy. *See, e.g.*, *United States v. Gomez-Pabon*, 911 F.2d 847, 853-54 (1st Cir. 1990) ("[M]ere association with other conspirators is not enough to support a conspiracy conviction.").

We do know that Daaiyah performed at least some work on Delante White's case. On September 15, 2008 – three days after the photo shoot – she accompanied Daum to examine the evidence police had seized. Daum's paralegal

testified that she was in a room with Daaiyah looking at photos in connection with Delante White's trial preparation. Daum's secretary testified that Iman and Daaiyah were the only investigators working for Daum at the relevant time, even as she could not say if Daaiyah had been working on the case. True, recorded jailhouse calls to Delante White reflect that both Candice Robertson and Brittany McDaniels reported that more than one of Daum's investigators facilitated the photo shoot – McDaniels, for example, referred to Daum's "squad." But Robertson and McDaniels disagreed as to whether Daaiyah, present in the courtroom during trial, was among Daum's employees at the photo shoot.

There is, undoubtedly, evidence suggesting that Daaiyah could have been involved in the photo shoot. But the eyewitness testimony regarding her participation was a crucial part of the Government's case against her. Whereas for Iman, there was other evidence supporting a theory of her involvement in the conspiracy and no witness – including Montgomery, based on his initial statement – who would rule out her participation, the evidence is much weaker for Daaiyah. Even accepting that she was "around" some other players in and events related to the conspiracy, the photo shoot testimony is the most meaningful evidence that she shared the conspiracy's objective and participated in it. That testimony was from witnesses, Candice Robertson and Jerome White, with grave credibility problems who received favorable plea agreements.

In this context, we conclude that Montgomery's testimony, if delivered in the form of his original statement and credited by the factfinder, would have created a reasonable probability of a different outcome as to Daaiyah's guilt. *See, e.g.*, *United States v. Tavera*, 719 F.3d 705, 713-14 (6th Cir. 2013) (remanding for new trial because "[w]e cannot

be confident how [a jury] would have" weighed competing evidence "in light of the entire record" under the "reasonable doubt" standard); *see also Smith v. Cain*, 132 S. Ct. 627, 630 (2012) ("[T]he State's argument offers a reason that the jury *could* have disbelieved Boatner's undisclosed statements, but gives us no confidence that it *would* have done so."). Our "confidence in the outcome" is undermined because, absent the Government's failure to comply with its *Brady* obligations, a reasonable factfinder might – or might not – have found Daaiyah's guilt beyond a reasonable doubt. *Bagley*, 473 U.S. at 678.

**3.**

That brings us to the question of what to do with Daaiyah's conviction. We previously have said: "[O]nce a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion." *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007). So our precedent dictates the remedy for the *Brady* violation here.

But when a new trial alone does not cure the prejudice, more is required. In *California v. Trombetta*, the Supreme Court observed that "fashioning remedies for the illegal destruction of evidence can pose troubling choices." 467 U.S. 479, 486 (1984). It continued: "In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence." *Id*. at 486-87.

We think helpful authority is to be found in *United States v. Bohl*, in which the Court of Appeals for the Tenth Circuit

held that dismissal was appropriate where "the disposition of evidence that is central to the case [has] permanently deprive[d] the defendant of due process." 25 F.3d 904, 914 (10th Cir. 1994). The case against Bohl turned on whether non-conforming steel had been used to build FAA towers under a Government contract, but the Government removed the towers while the defendant's request to test them was pending. Even though the court said "the exculpatory value was latent, rather than patent" because it became impossible to know what the tests would have shown, the destruction was charged against the Government, which had produced no explanation for spoliation of the relevant evidence. *Id.* at 910. The court therefore directed dismissal of the case.

As these cases involving the destruction of evidence show by analogy, courts must sometimes fashion remedies to address persistent prejudice arising from the prosecution's failure to timely disclose exculpatory evidence to the defense. *See United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981) (noting the possible necessity of more drastic remedies in cases where "there [is] continuing prejudice which . . . could not be remedied by a new trial").

Putting all this together, we think that following conviction, the applicable remedy analysis for a *Brady* violation is as follows: (1) a *Brady* violation requires a remedy of a new trial; (2) such new trial may require striking evidence, a special jury instruction, or other additional curative measures tailored to address persistent prejudice; and (3) if the lingering prejudice of a *Brady* violation has removed all possibility that the defendant could receive a new trial that is fair, the indictment must be dismissed. To be sure, dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988)

(holding that district court had no authority to dismiss where lesser remedy was available); *Morrison*, 449 U.S. at 365; *see also Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 254 (3d Cir. 2005) (joining Courts of Appeals for the Ninth and Tenth Circuits in concluding that dismissal may be appropriate remedy for *Brady* violation even as it will be a "rare sanction").

We now must apply the remedy analysis to the particular circumstances of delayed disclosure at issue here, where the *Brady* violation has caused prejudice in two respects: first, in trial preparation; and second, in the potential disappearance of memory and the availability of evidence.

On the first point, Daaiyah's counsel told the District Court just how late disclosure impeded his trial preparation:

> [B]esides the prejudice of trying to still continue to listen to phone calls until three in the morning and putting CDs in my car on the way in, on the way home, I now stop every day. I am not talking to my client. I am not preparing jury instructions. I am not meeting with [counsel for co-Defendants]. I am running around town trying to find this witness.

Indeed, "[i]t is not hard to imagine the many circumstances in which the belated revelation of *Brady* material might meaningfully alter a defendant's choices before and during trial: how to apportion time and resources to various theories when investigating the case, whether the defendant should testify, whether to focus the jury's attention on this or that defense, and so on." *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009).

Daaiyah's counsel never asked for a continuance, however, raising questions about any claim that additional trial preparation time would have made a difference to her case. *See United States v. Wilson*, 160 F.3d 732, 741 (D.C. Cir. 1998) (suggesting that failure to request a continuance undermines defendants' claim that they would have prepared for trial differently). Still, failing to recognize the costs of delayed disclosure would "create dangerous incentives for prosecutors to withhold impeachment or exculpatory information until after the defense has committed itself to a particular strategy during opening statements or until it is too late for the defense to effectively use the disclosed information." *Burke*, 571 F.3d at 1054. A new trial without more would, at least, address any remaining trial preparation issue for this particular Defendant.

The more challenging circumstance is that there is no way to determine what Montgomery would have said in sworn testimony timely obtained by Daaiyah's counsel. As the District Court noted: "We will never know whether that statement would have been favorable or unfavorable . . . . [W]hen credibility and memory are significant, not to say essential as they are in this trial, the eight-month passage of time can indeed detract from the ability to make sufficient use of the testimony." In other words, this case is less like one in which physical evidence has been turned over late and more like one in which physical evidence has been destroyed.

Still, the Government tells us we should do nothing. It cites *United States v. Dean*, 55 F.3d 640, 664 (D.C. Cir. 1995), for the proposition that failure to call a witness may undermine a claim that testimony would have affected the outcome of the trial. But *Dean*'s conclusion was premised on the fact that the defendant had "effectively used, or had an

opportunity to use, all the late-disclosed or unsegregated exculpatory evidence at trial." *Id.* Our case is different because we must assume the witness's memory did not hold through the delay. Montgomery himself told defense counsel that, had they interviewed him at the time of his original statement, he "would have been able to tell [them] more." Moreover, defense counsel contended that Government agents "impeded and frustrated" Montgomery's willingness to cooperate with them. Defendants' decision not to call Montgomery in these circumstances does nothing to show they would not have called him had they timely learned of his original statement. Daaiyah's counsel told the District Court in his trial opening that Montgomery would testify that the investigators were a man and a woman in her thirties who could not have been Daaiyah. But at the time of that opening statement, the District Court had deferred ruling on the defense motions for sanctions. Given that he had no curative remedy to rely on, the decision by Daaiyah's counsel not to call Montgomery is understandable on account of concern that the Government would cross-examine him with the inconsistent statements he recently had made.

Thus, something more than a new trial is required to avoid prejudice to Daaiyah. The Government's actions have resulted in a situation in which, absent additional remedy "[a] new trial would be simply a repetition of the first trial, similarly infected by non-disclosure of discoverable evidence." *United States v. Bryant*, 439 F.2d 642, 653 (D.C. Cir. 1971), *abrogated in part on other grounds by Arizona v. Youngblood*, 488 U.S. 51, 67-71 (1988).

Defendants presented the District Court with multiple suggestions for appropriate remedies. In their written pretrial motion, they proposed an order precluding the Government from introducing any testimony regarding the photo shoot.

During the trial they asked the District Court to preclude the Government from cross-examining Montgomery, and the District Court denied that request. We appreciate that the first proposed remedy would be extreme and the second proposed remedy unusual. It appears that the District Court may have thought it lacked authority to impose such remedies. *See* Tr. June 5, 2012 (p.m.) at 4 ("[T]here's absolutely no case law supporting such a drastic, draconian way of dealing with the problem and mitigating any prejudice."). To the contrary, however, if a remedy is available that gives the defendant a fair trial – such as precluding cross-examination completely or precluding impeachment with a prior statement – that remedy is preferable to dismissal of the indictment. *See, e.g.*, *United States v. Makarita*, 576 F. App'x 252, 262 (4th Cir. 2014) (approving district court's curative instruction telling the jury to disregard certain testimony related to withheld evidence); *see also Dean*, 55 F.3d at 664 (discussing approvingly a district court giving defense counsel the choice of remedy for a *Brady* violation to strike documents, give cautionary instructions to the jury, or simply cross-examine and seek to discredit testimony). "Where the district court concludes that the government was dilatory in its compliance with *Brady*, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial." *Burke*, 571 F.3d at 1054. Indeed, "[t]he choice of remedy is in the sound discretion of the district court." *Id.*; *see also United States v. Miranda*, 526 F.2d 1319, 1325 n.4 (2d Cir. 1975) (stating that where Government has failed to carry out its *Brady* obligations, appropriate sanctions may include "the exclusion or suppression of other evidence concerning the subject matter of the undisclosed material").

It is important to our conclusion that Daaiyah's counsel engaged in a good faith effort to craft a sanction that would fit the Government's violation.  Almost invariably, it will not do for a defendant to tell a district court that the only cure is dismissal of the indictment, and then to settle for something less on appeal that would be a basis for a second trial.  Here, we think the defense gave the District Court some reasonable options.  And the motivation concern works the other way, too, in that a prosecutor who learns of a *Brady* failure must have incentive to work with the court to remedy the violation rather than, as was done here, to ask only that the failure be forgiven and forgotten.  The effectiveness of our system requires more:  As an inscription in the alcove outside the Attorney General's Office reads, "The United States wins its point whenever justice is done its citizens in the courts." Quoted in David W. Ogden, Memorandum for Department Prosecutors, Jan. 4, 2010, *at http://www.justice.gov/dag/ memorandum-department-prosecutors-0.*

We do not reach our new trial conclusion lightly, not least because the charges in this case relate to the integrity of process in our courts.  There is, however, no way around the fact that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  "By now government prosecutors should know: 'Betray *Brady*, give short shrift to *Giglio*, and you will lose your ill-gotten conviction.'" *Vaughn v. United States*, 93 A.3d 1237, 1267 (D.C. 2014) (quoting *United States v. Olsen*, 737 F.3d 625, 633 (9th Cir. 2013) (Kozinski, C.J., dissenting from denial of petition for rehearing en banc)).  The application of that rule is the bottom line here.

### III.

For the foregoing reasons, we affirm all convictions of Appellants Daum and Iman Pasha, and we vacate the conviction of Appellant Daaiyah Pasha and remand to the District Court for proceedings consistent with this opinion.  It is

*So ordered.*