**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0308n.06

**No. 17-3220**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 18, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CHRISTOPHER SMITH, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| WARDEN, TOLEDO CORRECTIONAL | ) | SOUTHERN DISTRICT OF |
| INSTITUTION, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | OPINION |
| | ) | |

BEFORE: NORRIS, STRANCH, and LARSEN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Christopher Smith was convicted of armed robbery in Ohio state court and sentenced to 18 years' imprisonment. He challenges this conviction in a habeas petition under 28 U.S.C. § 2254. The district court determined that two of his claims failed on the merits and his other five claims were procedurally defaulted. We agree that Smith's claims are procedurally defaulted—with one minor exception—but hold that the ineffective assistance of appellate counsel excuses the procedural default of his *Brady* claim. For the following reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

## I.   BACKGROUND

### A.   Factual Background

Because Smith's legal claims depend on the strength—or weakness—of the evidence against him, we discuss the evidence adduced at his bench trial and a post-trial hearing in detail.

1.   <u>The Prosecution's Evidence at Trial</u>

A black man wearing sunglasses, a facemask, and a wig entered a wireless telephone store in Cincinnati at about 3:40 p.m. on October 17, 2007.  He pointed a gun in the air and took the till, which contained $700 or $800.  A store employee could not identify the robber when the police later showed him a photo array because the robber's face was obscured.

Thomas Moore was driving nearby when he noticed a man peering into the store window.  This man put on a wig, pulled something up around his neck, pulled out a gun, and entered the store.  Moore called 911.  A few minutes later, Moore saw this man run out of the store carrying what looked like a laptop and climb into the front passenger seat of a blue Ford Expedition.  Moore followed, getting a partial number for the temporary license plate and noting the name of the car dealer, which he relayed to 911.  Before he lost sight of the Expedition, Moore saw the passenger, whose face was no longer obscured, from about 10 feet away.  Moore did not see him for long— maybe the time that it took "for two or three cars to pass."

Based on the information provided by Moore, the Cincinnati police called the car dealership and learned that it had sold the Expedition to Jennifer Potts.  Potts told the police that she had bought the car for Christopher Smith, the defendant, to drive.

The police then generated a photo array containing Smith's image.  About three hours after the robbery, a police officer who already had Smith "in mind as a suspect" showed Moore this photo lineup.  Moore identified Smith as the robber and passenger in the Expedition.  Over six months later, in May 2008, Moore identified Charles Allen as the driver.

Shortly after responding to the call for this robbery, the police found the blue Expedition parked at a nearby apartment complex. A K-9 unit found a black t-shirt in the rear yard of a house in the vicinity. Officers also recovered a pair of sunglasses, a wig, and a nylon case from a trash can at the apartment complex.

Tracey Sundermier, a serologist for the Hamilton County Coroner's Crime Lab, conducted DNA testing on the t-shirt, sunglasses, and wig. She obtained multi-source DNA profiles by swabbing the inside collar area of the t-shirt and by "vigorously swabb[ing] the entire surface of the inside of the wig." She also swabbed the sunglasses but was unable to obtain a DNA profile. Smith was excluded from the DNA profile developed from both the t-shirt and the wig. Charles Allen could not be excluded from either profile. The portion of the population that could not be excluded from the DNA profile developed from the wig was 1 in 3.44 million.

The police learned that Smith was on parole and spoke to his parole officer. Smith was on parole for armed robbery and was subject to electronic location monitoring. For his ankle monitor to work, it had to be within a certain distance of a transmitter, which Smith was supposed to carry with him. Smith cut his ankle bracelet off a little under two hours after the robbery.

Smith told his parole officer that he had cut his ankle bracelet off because he was scared. He said that he had heard about the robbery from someone he had allowed to borrow his car and he had seen the police go to his apartment. He refused his parole officer's entreaties to turn himself in but asked her to check the GPS to verify his location at the time of the robbery and told her where his transmitter could be found. He also told her to "run the test" when he heard from her that the police had recovered the wig and other physical evidence. Smith's ankle monitor was not working from 2:35 until at least 4:20 p.m. on October 17, 2007, though, because of a "cuff leave violation," meaning that the transmitter was too far from the ankle bracelet for it to work. The

defense provided evidence that this was a common problem with Smith's GPS tracker, occurring almost every day.

Smith texted Potts at 5:17 p.m. and then 5:18 p.m. on October 17, 2007, telling her to report the Expedition stolen. He later told the police that he had seen a news report about this robbery, showing the car, on the five o'clock news. This news report aired at approximately 5:18 p.m.

The police apprehended Smith during a traffic stop a little over a month later. He told them that he had lent his car to "Chuck Allen," that Allen had sent him a text telling him what had happened, and that he was being framed. He said he had been avoiding the police because "he had just got done doing five years and he wasn't going to go down for something that he didn't do." He offered to submit to a buccal swab, to release his phone records, and to take a polygraph. But, once obtained, Smith's phone records did not show a text telling him what had happened.

2.  The Defense Case

Smith's brother, Ricardo Smith, was a close friend of Charles Allen. Seeking exculpatory evidence for his brother, Ricardo purportedly recorded his conversations with Allen. Recordings of these conversations were admitted into evidence at trial. In one, Ricardo told Allen that a witness reported that the robber was carrying a laptop when he ran out of the phone store. Allen asked, "A laptop?" Ricardo replied, "Yeah, that's what the witness said." Allen laughed and responded, "I didn't have a motherfucking laptop."

Shevon Mitchell, Smith's ex-girlfriend, testified that she recognized Ricardo's and Allen's voices on these recordings. She also testified that Allen had told her after this robbery that he had done "something stupid." Allen did not give her any details of what he had done but said he had borrowed Smith's car and that Smith was not there. She was no longer dating Smith at the time of trial and said that she would not lie for him.

Brittney Hatcher, Smith's live-in girlfriend and the mother of his daughter, testified that she saw Allen driving Smith's blue truck on October 17, 2007. Smith regularly lent his car to other people. She was watching television with Smith when they saw a news report saying that the police had found his truck. He was confused by this news report. He then noticed that the police were outside the apartment and went to go look for "Chuck" because Allen had his car.

3. The Prosecution's Rebuttal Case

Charles Allen testified for the prosecution in exchange for a promise that he would not be prosecuted for this crime. His charges had not been dropped at the time of trial; instead, they were being "ignored," and could be pursued later.

On the date of this incident, Smith picked Allen up in his blue truck, saying that they were going to see some women. Smith pulled into an apartment complex, told Allen to be prepared to move the car if the police came, then made a phone call and walked off. Allen did not pay attention to where Smith went.

Five to ten minutes later, Allen heard a "boom" as Smith ran into the car, using it to stop himself. Smith got into the back seat and told Allen "drive, drive." Allen shifted into the driver's seat and drove to a nearby apartment complex, where he parked the Expedition. The two men then split up on foot.

Allen never saw Smith with a wig, though Allen testified that Smith had asked him about Allen's girlfriend's wigs. When asked on cross-examination whether his DNA could be on the wig found by the police, Allen insisted that the t-shirt was the only thing his DNA could be on. He had previously left a black t-shirt in Smith's car.

Allen also denied that it was his voice on the recordings made by Ricardo Smith. He admitted, however, that it was his voice on a recording of a phone call he made to his girlfriend from jail, saying 10 or 12 times that he was "salty Rick was wired every time we met up." He explained that "salty" means "mad" or "upset."

4. Closing statements and verdict

During the closing statements in this bench trial, the prosecution argued that the court should credit the statements of Moore and Allen and find Smith guilty of aggravated robbery as a principal, not an accessory. The defense responded that this was a case of police tunnel vision and that, although the initial evidence pointed to Smith, the physical evidence and Allen's recorded statements showed that Allen, not Smith, was the robber. During the defense's closing argument, the court repeatedly interrupted counsel to bring up evidence that it believed undercut the defense's version of events.

Immediately after the closing statements, the court rendered its verdict. The court stated that Moore's eyewitness testimony was "further corroborated by the fact Chuck Allen's DNA is found on some of the evidence." After noting that a person's DNA can get on an object by touching it, the court stated: "I don't have a problem with the fact that the defendant put the wig on but his DNA was not found on it but Chuck Allen's was, because he was in the car, too, he touched it also." Moore's eyewitness identification of Smith as the robber, taken together with Allen's testimony that Smith was in the car and Allen's DNA on the wig, "adds up to one thing[—]that the defendant did in fact commit this offense." The court found Smith guilty on all counts and sentenced him to 26 years' imprisonment.

   5.  The New Trial Motion

Julie Heinig, PhD, assistant laboratory director for the DNA Diagnostic Center, testified for the defense at a hearing on a motion for a new trial.

Dr. Heinig explained the faults in the DNA data turned over in discovery. She testified that the laboratory notes are necessary to determine how heavily present someone's DNA is on an item. But all the State disclosed before trial was a two-page report. From reading this report, she could not tell whether Allen's DNA was found at every locus tested or just one or two of them. The report stated only whether a subject's DNA was included or excluded and gave the statistical probability of inclusion. Only by reviewing the underlying lab notes was she able to see that alleles consistent with Allen were present at every locus tested on the t-shirt and almost every locus tested on the wig. These notes, however, were not turned over until at least six months after trial.

Dr. Heinig's laboratory re-tested the sunglasses, wig, and t-shirt. When she swabbed the sunglasses for DNA, she also swabbed the rims of the lenses, which the initial examiner had failed to do. She found DNA consistent with Allen on every locus she re-tested on the wig. She also found DNA matching Allen at seven loci on the sunglasses. There was a heavy presence of Allen's DNA on the wig and sunglasses. Smith's DNA was not found on either item. She did not find any DNA on the t-shirt. The amount of Allen's DNA on the sunglasses and wig was likely inconsistent with him briefly touching them or passing them to someone, especially given that her laboratory swabbed inside the wig. Finally, she concluded that although the amount of DNA is not definitive evidence, it is more likely that Allen wore these items.

Dr. Heinig conceded that Smith could have touched or even worn the sunglasses and wig without leaving any DNA behind. But the longer someone wears an item, the more likely it is that they will deposit DNA. Dr. Heinig also noted that if someone is sweating and their "adrenaline is

going," they may be more likely to leave DNA. On October 17, 2007, the high was 77 degrees with 90 percent humidity.

At the end of the hearing, the trial court gave its initial thoughts about this new evidence. It stated, "you might have an argument if you're trying it to a jury, but you're trying the case to me, and I'm also deciding this motion for new trial. . . . I have no doubt that both these guys were involved in this." The court also speculated that Allen may have worn the wig and sunglasses while committing other robberies. The court then adjourned the hearing. It subsequently summarily denied the new trial motion in a written order, without further explanation.

### B. Procedural History

#### 1. Direct appeal

On direct appeal, Smith raised four issues. Appellate counsel did not raise a *Brady* claim, however, even though the appeal was filed after the denial of the new trial motion. The Ohio Court of Appeals affirmed Smith's conviction but agreed with Smith that it was error to impose "separate sentences for aggravated robbery and robbery and remand[ed] . . . for sentencing on only one of the offenses." On remand, Smith was resentenced to 18 years' imprisonment. He then filed a second appeal, raising sentencing issues that are not relevant here. He did not ask the Supreme Court of Ohio to review his direct appeal.

#### 2. First Rule 26(B) application

Represented by new counsel, Smith next filed an application to reopen his direct appeal under Ohio Rule of Appellate Procedure 26(B). Smith's Rule 26(B) application raised three claims of ineffective assistance of appellate counsel (IAAC), one of which pertained to the failure to appeal the denial of the new trial motion.

The Ohio Court of Appeals denied the Rule 26(B) application, holding that Smith had "failed to demonstrate a genuine issue as to whether he has a colorable claim of ineffective

assistance of counsel on appeal." As relevant here, it held that the trial court did not abuse its discretion in denying the new trial motion. The court of appeals stated that the undisclosed lab notes were not "material" under *Brady* because they "could not 'reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Smith unsuccessfully petitioned the Supreme Court of Ohio to review this denial.

3. § 2254 petition

Smith then filed a habeas petition under 28 U.S.C. § 2254 in the Southern District of Ohio. He was once again represented by his initial trial counsel, who continues to represent him.

Smith raised seven claims for relief. First, the State's failure to disclose the lab notes violated the Confrontation Clause and *Brady v. Maryland*, 373 U.S. 83 (1963). Second, the trial court's factual conclusions underlying the guilty verdict and denial of Smith's motion for a new trial based on speculation that Smith may have been an accessory materially varied from the State's allegation in the indictment and bill of particulars that Smith was a principal. Third, the court violated due process by convicting Smith against the weight of the evidence and based on facts not in the record. Fourth, the court's conduct during the defense's closing argument violated Smith's due process right to an impartial judge. Fifth, the court violated Smith's right against self-incrimination by stating that it could not understand his defense without his testimony. Sixth, the court violated the Confrontation Clause by relying on its own personal knowledge of locations rather than deciding the case based on the trial evidence. Seventh, appellate counsel was ineffective for failing to raise claims one, two, three, five, and six (but not four) on direct appeal.

Smith subsequently moved the district court to stay his § 2254 petition while he exhausted his state remedies. The habeas petition was stayed while counsel filed a second Rule 26(B) application and a postconviction motion in state court on behalf of Smith.

4. Second Rule 26(B) application

Smith raised seven IAAC claims in a second Rule 26(B) application, which were largely coextensive with the claims in his § 2254 petition. The State responded that Smith's second Rule 26(B) application should be denied on procedural grounds because successive Rule 26(B) applications are not allowed, and Smith had not shown good cause for the untimeliness of his application. The Ohio Court of Appeals issued a three-line summary denial, stating that "the application is not well taken and is overruled." Smith attempted to appeal this denial to the Supreme Court of Ohio, but it "decline[d] to accept jurisdiction of the appeal."

5. Postconviction petition

Smith also raised the seven claims from the § 2254 petition, as well as a claim of actual innocence, in a postconviction petition filed in state court. The trial court denied this petition, concluding that (a) seven of the grounds for relief were barred by the doctrine of res judicata because they could have been raised at trial and most were raised on direct appeal, and (b) the eighth ground—IAAC—could not be raised in a postconviction petition under Ohio law.

The Ohio Court of Appeals affirmed the trial court's order. Primarily, it did so because "Smith failed to satisfy either the time restrictions of R.C. 2953.21(A)(2) or the jurisdictional requirements of RC 2953.23. Therefore, the postconviction statutes did not confer upon the common pleas court jurisdiction to entertain Smith's petition on the merits." The Supreme Court of Ohio once again "decline[d] to accept jurisdiction of the appeal."

The following table summarizes which claims were raised in which court.

| | Claims in the § 2254 petition | Motion for a new trial | Direct appeal | First Rule 26(B) | Second Rule 26(B) | Post-conviction petition |
|---|---|---|---|---|---|---|
| Claim 1 | *Brady*/Confrontation Clause (failure to disclose lab notes) | Raised | Not raised | Raised in part (as IAAC claim) | Raised as IAAC claim | Raised |
| Claim 2 | Variance between court's findings and State's theory of case | Not raised | Not raised | Not raised | Raised as IAAC claim | Raised |
| Claim 3 | Weight of the evidence/legal insufficiency | Raised | Raised only to Ohio Court of Appeals | Raised only to Ohio Court of Appeals | Raised as IAAC claim | Raised |
| Claim 4 | Judicial bias during closing arguments | Not raised | Not raised | Raised as IAAC claim | Raised as IAAC claim | Raised |
| Claim 5 | Violation of Fifth Amendment privilege against self-incrimination | Not raised | Not raised | Not raised | Raised as IAAC claim | Raised |
| Claim 6 | Verdict based on personal knowledge not in evidence | Not raised | Raised only to Ohio Court of Appeals | Not raised | Raised as IAAC claim | Raised |
| Claim 7 | Ineffective assistance of appellate counsel | Not raised | Not raised | N/A | N/A | Raised |

6. Proceedings in the district court

Once Smith's state postconviction petition and second Rule 26(B) application were denied, the district court lifted the stay of the § 2254 petition. The magistrate judge issued a Report and Recommendation (R&R) that the district court deny the § 2254 petition in its entirety. The magistrate judge concluded that claims one, two, four, five, and six were procedurally defaulted. The magistrate judge also concluded that "[a] weight of the evidence claim is not a federal constitutional claim" and thus claim three was not cognizable on habeas review. Finally, the magistrate judge rejected the IAAC claim (claim seven) on the merits. After finding that only a

claim of IAAC for failure to raise the *Brady* claim had been properly presented in state court, the magistrate judge concluded that the Ohio Court of Appeals' adjudication of this claim was "neither contrary to nor an objectively unreasonable application of *Strickland*" because the undisclosed lab notes may have strengthened the conclusion that "the DNA from the wig and the T-shirt excluded Smith and included Allen . . . , but not enough to make a difference in the verdict."

The district court adopted this R&R, dismissing the § 2254 petition in its entirety. But the court granted Smith a certificate of appealability (COA) as to all his claims. Specifically, it granted a COA "as to whether the Court was correct in finding a procedural default, whether the Court was correct in finding no excuse to the procedural default exists, and whether the Court was correct in not considering the merits" of all the claims that it had held to be procedurally defaulted. It did not grant a COA as to the merits of these claims. The court also granted a COA as to whether it was correct to dismiss claim three (weight of the evidence) and claim seven (IAAC) on the merits.

## II.  ANALYSIS

"In a habeas proceeding, we review the district court's legal conclusions de novo and its factual findings for clear error." *Henderson v. Palmer*, 730 F.3d 554, 559 (6th Cir. 2013).

### A.  Procedural Default

The central issue in this appeal is whether Smith is barred from having his claims heard on the merits because of procedural default. For a state petitioner to present his claims in federal habeas, he must first exhaust his state remedies and "meet the State's procedural requirements for presenting his federal claims." *Coleman v. Thompson*, 501 U.S. 722, 729–32 (1991). If a petitioner does not meet these requirements, federal courts cannot review his claims on the merits "unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or that failing to review the claim would result in a fundamental miscarriage of justice." *Williams v.*

*Anderson*, 460 F.3d 789, 805–06 (6th Cir. 2006) (citing *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006)). A petitioner can fail to meet procedural requirements in two ways:

> First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.
>
> Second, a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's ordinary appellate review procedures. If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted.

*Id.* at 806 (citations and internal quotation marks omitted). Under this second route, a claim is procedurally defaulted if a petitioner initially raises it on direct appeal but does not seek review by the state's highest court. *Id.* (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999)).

Smith's appellate counsel did not seek review of his direct appeal by the Supreme Court of Ohio. He therefore failed to pursue any claims raised on direct appeal "through the state's 'ordinary appellate review procedures.'" *Id.* (citing *O'Sullivan*, 526 U.S. at 847–48). And, as he concedes, bringing an IAAC "claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because 'the two claims are analytically distinct.' Thus, a Rule 26(B) application 'based on ineffective assistance cannot function to preserve' the underlying substantive claim." *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) (quoting *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005)).

Smith's only argument that the first six claims of his § 2254 petition are not procedurally defaulted is that he raised them in a postconviction petition. But, as explained below, Smith's postconviction petition does not save his claims from procedural default either.

This circuit uses a "four-part test to determine whether we are precluded from reviewing a federal habeas claim" due to a petitioner's procedural default. *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 464 (6th Cir. 2015) (citing *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986)).

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . . Third, the court must decide whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . [Fourth, o]nce the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was 'cause' for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin*, 785 F.2d at 138 (citations omitted).

To determine whether state courts relied on a procedural bar, federal habeas courts look to the "last *explained* state-court judgment." *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).[1] In its decision affirming the denial of Smith's postconviction petition, the Ohio Court of Appeals held that "most significant, and dispositive here, is the fact that Smith failed to satisfy either the time restrictions of R.C. 2953.21(A)(2) or the jurisdictional requirements of RC 2953.23." In relevant part, these statutes require that a postconviction petition be filed within 365 days of the date that "the trial transcript is filed in the court of appeals in the direct appeal," Ohio Rev. Code Ann. § 2953.21(A)(2), unless a petitioner can (a) show that he "was unavoidably prevented from discovery of the facts upon which [he] must rely to present the claim for relief" *and* (b) "show[] by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty," *id.* § 2953.23(A)(1).

---

[1] For this reason, we do not discuss the state trial court's holding that Smith was barred from raising the issues in his postconviction petition by res judicata.

The state-court decision satisfies the first three steps of the *Maupin* test. There is a state-law timeliness requirement for postconviction petitions, with which Smith did not comply. The Ohio Court of Appeals enforced this timeliness requirement, describing it as dispositive of Smith's appeal. And denying a postconviction motion or appeal based on untimeliness is an independent and adequate state procedural ground. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 310–11 (2011); *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007); *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004). Indeed, Smith does not dispute that Ohio law imposes a timeliness requirement on postconviction petitions, that his petition was untimely, or that the Ohio Court of Appeals stated that it was relying on this procedural bar in affirming the denial of his postconviction petition.

Smith seems to take issue only with the third step of the *Maupin* analysis, arguing that the timeliness requirement was not an "independent and adequate state ground" because whether he fits into an exception to the timeliness requirement "necessarily involves or is interwoven with consideration of the federal constitutional issues." He relies on a single case for this argument, *Harris v. Reed*, where the Supreme Court held that "a procedural default does not bar . . . habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." 489 U.S. 255, 263 (1989) (citation omitted). Yet the Court subsequently made clear that this rule was restricted to cases in which the state-court "decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'" *Coleman*, 501 U.S. at 734–35 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983)). Here, the Ohio Court of Appeals' decision "'fairly appears' to rest primarily on state law" because "[t]here is no mention of federal law." *Id.* at 740.

Although Smith argues that the Ohio Court of Appeals necessarily had to consider the merits of Smith's underlying grounds for relief, which raised several federal constitutional issues, to determine whether he was "unavoidably prevented" from timely filing his post-conviction petition, the relevant statute says otherwise. Smith needed to show only that he was "unavoidably prevented from *discovery of the facts* upon which the petitioner must rely to present the claim for relief." Ohio Rev. Code Ann. § 2953.23(A)(1) (emphasis added). And determining whether Smith had knowledge of the facts underlying his claims—as opposed to whether he was aware he had legal claims for relief—requires no analysis of the federal issues.

We therefore find that the first six claims in Smith's § 2254 petition are procedurally defaulted. (The issue of whether the seventh claim, IAAC, is procedurally defaulted is discussed in subsection C below.) The only remaining question under the *Maupin* analysis is whether Smith can show either a miscarriage of justice or cause and prejudice to get around his procedural default.

**B.      Miscarriage of Justice**

Smith relies principally on a claim of actual innocence to bypass his procedural default by passing through the miscarriage-of-justice gateway. *See Schlup v. Delo*, 513 U.S. 298, 314–15 (1995). The term "actual innocence" is somewhat of a misnomer, though, as this inquiry focuses on legal proof. To have defaulted claims considered on the merits, petitioners are not required to prove their factual innocence but rather "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327.

In *Schlup*, the Supreme Court held that a petitioner who "show[s] that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence" can "avoid a procedural bar to the consideration of the merits of his constitutional claims." *Id.* For such a claim "[t]o be credible," a petitioner must "support his allegations of constitutional error with new

reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. Once a petitioner has provided such new reliable evidence, the habeas court must assess all the evidence, including evidence "that was either excluded or unavailable at trial." *Id.* at 328. *Schlup* then requires courts "to make a probabilistic determination about what reasonable, properly instructed jurors *would* do." *Id.* at 329 (emphasis added). But the Court repeatedly cautioned that this procedural bypass was available only in "extraordinary" cases. *Id.* at 322, 324, 327.

The Court subsequently reaffirmed *Schlup* in *House v. Bell*, 547 U.S. 518, 539 (2006), holding that this standard survived the passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *House* reiterated that once a petitioner has provided new reliable evidence, "the habeas court's analysis is not limited to such evidence." *Id.* at 537. The Court also reemphasized that "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *Id.* at 538 (quoting *Schlup*, 513 U.S. at 327). Nonetheless, the Court reversed this circuit's denial of habeas relief, concluding that though "[t]his is not a case of conclusive exoneration," it is "the rare case where . . . it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.* at 554. Substantial "aspects of the State's evidence . . . still support[ed] an inference of guilt. Yet the central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put forward substantial evidence pointing to a different suspect." *Id.*

Smith's *Schlup* claim is premised on two pieces of evidence not presented at trial: (1) the lab notes disclosed after trial, which revealed just how much of Allen's DNA was on the wig, and (2) the re-testing of the sunglasses, which found DNA matching Allen but not Smith. (The lab notes are also the factual basis for Smith's *Brady* claim, as discussed below.) Ohio does not contest

that this constitutes new evidence. Nor does Ohio provide any substantial argument that this DNA evidence is not reliable. It claims, without elaboration, that "the new evidence is not reliable in relation to the essential facts of the case" because "[t]he defense witness, Dr. Heinig, admitted that Smith could have touched [the wig] and not left DNA." This argument, however, goes only to the probative value of this evidence and not its reliability.

Ohio has a substantially stronger argument as to whether Smith's new evidence is sufficient, when reviewed in the context of the whole record, to meet his burden of showing that it is "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. As Ohio points out, Smith was identified by a civilian eyewitness as the robber, the robbery was committed using his car, Smith's GPS tracker was malfunctioning at the time of this robbery, he later cut off his ankle bracelet and absconded, he told Potts to report the car stolen, and Allen testified that Smith was in the vicinity of the store at the time of the robbery.

On the other hand, the exculpatory force of the DNA evidence should not be understated. Smith's DNA was not found on the glasses or wig, and Dr. Heinig's retesting showed a heavy presence of Allen's DNA on these items. Certainly, it is possible that Smith wore these items without leaving any DNA behind—as she admitted. But Dr. Heinig also testified that the longer a person wears an item, the more likely it is that he will leave DNA behind. And she testified that the amount of Allen's DNA found on the sunglasses and wig indicates that he likely did not just briefly touch these items, especially given that her laboratory swabbed *inside* of the wig for DNA. Yet Allen could not explain how his DNA got on either item. The simplest and most plausible explanation for this evidence is that Allen—not Smith—wore this costume during the robbery.

Smith also somewhat counteracts the circumstantial case against him. He provided evidence that he lent his car to Allen on the day of the robbery; that his GPS tracking device was

frequently prone to error; that he sent text messages to Potts telling her to report the car stolen at the approximate time that a news story aired showing that his car had been used in a robbery; and that he told his parole officer where to retrieve his GPS transmitter. It also helps him that he told his parole officer and the police to run DNA tests on the physical evidence. If Smith had been wearing the wig and sunglasses during this robbery, it hardly seems likely that he would be confident that a DNA test would clear his name.

None of this provides sufficient proof, however, of Smith's innocence. Moreover, one element of the prosecution's proof was not circumstantial and remains entirely unrebutted—the eyewitness identification of him as the robber. Weighing all the evidence, old and new, we are left with concerns about the soundness of the conviction in this case. A reasonable juror could harbor a reasonable doubt as to Smith's guilt. But *Schlup* demands more.

Although a petitioner is not required to show a "conclusive exoneration," *House*, 547 U.S. at 553, the actual-innocence gateway for procedurally defaulted claims is restricted to "extraordinary" cases, *Schlup*, 513 U.S. at 327. Smith must "show that it is more likely than not that *no* reasonable juror would have convicted him in the light of the new evidence." *Id.* (emphasis added). That he cannot do. Despite the DNA evidence pointing to Allen, a reasonable juror could still find Smith guilty based on the malfunctioning of his electronic monitoring device at the time of the robbery, his subsequent cutting of his ankle bracelet and flight from the police, his possession of the car used in this robbery, and the testimony of Allen and Moore. Indeed, Moore was a highly credible witness, who testified without any apparent motive other than his civic duty. Thus, although it is a close question, *Schlup* does not allow Smith to bypass his procedural default.

### C.    Cause and Prejudice

Because Smith cannot establish a miscarriage of justice, the next question is whether he can provide cause for and prejudice from his procedural default.  Smith argues that the IAAC claims raised in his Rule 26(B) applications provide both.  (Rule 26(B) applications are the primary—but not exclusive—procedural vehicle for raising IAAC claims under Ohio law.)

Ineffective assistance of appellate counsel "may provide cause to excuse a procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits." *Gunner v. Welch*, 749 F.3d 511, 516 (6th Cir. 2014) (quoting *Martinez v. Ryan*, 566 U.S. 1, 11 (2012)).  Moreover, "establishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice" to excuse procedural default. *Joseph v. Coyle*, 469 F.3d 441, 462–63 (6th Cir. 2006) (citations omitted).

An IAAC claim used to establish cause and prejudice to excuse procedural default, however, must itself have been properly presented to the state courts—or there must be cause and prejudice to excuse the failure to do so. "[A] procedurally defaulted ineffective-assistance-of-counsel claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000).

Because the IAAC claims raised in Smith's second Rule 26(B) application pertain to all his defaulted claims, while the IAAC claims raised in his first Rule 26(B) application would excuse the default of only his *Brady* claim, we deal with the second Rule 26(B) application first.

1. The Second Rule 26(B) Application

Ohio argues that the IAAC claims presented in Smith's second Rule 26(B) application are themselves procedurally defaulted and there is no cause and prejudice to excuse this default. Smith disagrees. We will proceed through the *Maupin* factors in turn.

a.       *Procedural Default of IAAC claims*

First, we ask whether there is "a state procedural rule that is applicable to the petitioner's claim and [whether] the petitioner failed to comply with the rule." *Maupin*, 785 F.2d at 138. Although Smith argues that there is no per se rule barring successive Rule 26(B) applications, the Supreme Court of Ohio has held otherwise. "[T]here is no right to file successive applications for reopening under [Rule] 26(B). . . . Once ineffective assistance of counsel has been raised and adjudicated, res judicata bars its relitigation." *State v. Twyford*, 833 N.E.2d 289, 290 (Ohio 2005) (citation and internal quotation marks omitted); *see also State v. Richardson*, 658 N.E.2d 273, 274 (Ohio 1996) (holding that Rule 26(B) does not "provide[] for second and subsequent applications for reopening"). Smith argues that this principle does not apply where a second Rule 26(B) application "addresses entirely new instances of IAAC and errors committed by a different appellate attorney." But he provides no authority for this proposition, and we are aware of none. Moreover, he has no basis to argue that a second Rule 26(B) application is available to address the errors of the attorney who represented him on the first Rule 26(B) application. A Rule 26(B) "application for reopening is a 'collateral postconviction remedy,' and the state 'has no constitutional obligation to provide counsel to those defendants who file applications under that rule.'" *Twyford*, 833 N.E.2d at 290 (quoting *Morgan v. Eads*, 818 N.E.2d 1157, 1159, 1161 (Ohio 2004)); *see also Lopez v. Wilson*, 426 F.3d 339, 351–52 (6th Cir. 2005) (en banc). Because there is no constitutional right to counsel in Rule 26(B) proceedings, there can be no ineffective assistance of Rule 26(B) counsel claim. *See Coleman*, 501 U.S. at 752.

Next, "the court must decide whether the state courts actually enforced the state procedural sanction." *Maupin*, 785 F.2d at 138. This is a closer question. The Ohio Court of Appeals did not explain its decision to deny Smith's second Rule 26(B) application, stating only "the application is not well taken and is overruled." *Coleman* dictates, however, that when a state court issues such a summary denial and the grounds given by the prosecution for doing so are solely questions of state procedure, the decision fairly appears to rest on state law. *See* 501 U.S. at 740. In this case, the main arguments the State made for denying the application were procedural; its merits arguments did not even address all of Smith's claims. The decision can therefore be assumed to rest on state procedural law.

Smith nonetheless argues that this decision should be construed as a decision on the merits, not a denial on procedural grounds. He relies on *Harrington v. Richter*, which held that an unexplained summary denial counts as an "adjudicat[ion] on the merits." 562 U.S. 86, 98–99 (2011). This argument conflates the similar but analytically distinct questions of when a state-court decision is based on the merits for purposes of procedural-default analysis—the issue addressed by *Coleman*—and when a case was adjudicated on the merits for purposes of AEDPA deference—the issue addressed by *Harrington*. Moreover, even if *Harrington* were on point, it would not help Smith. *Harrington* held that "it may be presumed that the state court adjudicated the claim on the merits *in the absence of any indication or state-law procedural principles to the contrary*." *Id.* at 99 (emphasis added). But, here, both the prosecution's briefing and state-law principles indicate that Smith's second Rule 26(B) application was denied on procedural grounds.

"Third, the court must decide whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Maupin*, 785 F.2d at 138 (citations omitted). Here, Smith essentially rehashes his

arguments about adequate and independent grounds from his postconviction petition, arguing that determining whether he had cause to file an untimely Rule 26(B) application and whether his application was barred by res judicata involves inquiry into questions of federal law. His argument fares no better in this context. Smith argued to the Ohio Court of Appeals that he had good cause for filing a delayed 26(B) application because he "had no means of realizing that his appellate counsel had performed deficiently." Smith now argues that "evaluating 'good cause' . . . necessarily involves considering the federal constitutional issue of what constitutes IAAC." But the Ohio Supreme Court has said that a lack of legal counsel, a lack of legal training, and ignorance of the law does not constitute "good cause" for an untimely 26(B) application. *State v. LaMar*, 812 N.E.2d 970, 972 (Ohio 2004); *see also State v. Carpenter*, 659 N.E.2d 786, 786 (Ohio 1996). There was thus no occasion for the Ohio courts to consider what constitutes IAAC in holding that Smith failed to show good cause, and Smith alleges no other federal hook.

We therefore find that the IAAC claims raised in Smith's second Rule 26(B) application are themselves procedurally defaulted. For Smith to use these claims to excuse the procedural default of the first six claims of his § 2254 petition, he must first provide cause for and prejudice from this procedural default. *See Edwards*, 529 U.S. at 450–51.

> b.     *Cause and Prejudice for Procedural Default of IAAC claims*

Smith appears to argue that there is cause and prejudice for the procedural default of these claims because counsel for the initial Rule 26(B) application was himself ineffective. This argument is based on *Martinez v. Ryan*, where the Supreme Court held that the ineffective assistance of counsel or lack of counsel in postconviction proceedings can excuse the failure to raise a claim of ineffective assistance of trial counsel when such a claim must be first raised in postconviction proceedings. 566 U.S. at 17. Thus, though ineffective assistance of postconviction

counsel is not a freestanding claim for federal habeas relief, it can provide cause under certain circumstances for a petitioner to overcome procedural default. *Id.*

Smith's argument for extending *Martinez* is foreclosed by both Sixth Circuit and Supreme Court precedent. Ohio law is clear that Rule 26(B) provides a "collateral postconviction remedy." *Morgan*, 818 N.E.2d at 1159. This court has held, however, that "ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel." *Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013). So has the Supreme Court. In *Davila v. Davis*, the Court declined to extend the rule of *Martinez* and *Trevino v. Thaler*, 569 U.S. 413 (2013), to allow ineffective assistance by state postconviction counsel to provide cause for the default of claims of ineffective assistance of appellate counsel. 137 S. Ct. 2058, 2062–63 (2017). Thus, even if Smith's first Rule 26(B) counsel was ineffective, this cannot provide cause to excuse the default of the IAAC claims in his second Rule 26(B) application.

Because the IAAC claims Smith raised in his second Rule 26(B) application are themselves procedurally defaulted, and there is no cause and prejudice excusing this default, he cannot use these IAAC claims to excuse the procedural default of the first six claims of his § 2254 petition. *See Edwards*, 529 U.S. at 450–51. We therefore affirm the district court's dismissal of claims two, three, five, and six based on procedural default. We note that although the district court rejected one of these claims on the merits, we do not reach the merits question because this claim is procedurally defaulted and there is no excuse for this procedural default. We "may affirm on any ground supported by the law and the record." *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 859 (6th Cir. 2018).[2]

---

[2] Smith also argues that any procedural default on his part should be excused because of the "absence of available State corrective process" or "circumstances . . . that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). He misconstrues this exception. It is a statutory

Two cause and prejudice questions remain. We still must address whether the claim of IAAC for failure to argue the *Brady* claim raised in Smith's first Rule 26(B) application, which Ohio concedes is not procedurally defaulted, provides cause and prejudice to excuse the default of the *Brady* claim. And we must do the same for the claim of IAAC for failure to raise judicial bias, which was likewise raised in the first Rule 26(B) application.

### 2. The First Rule 26(B) Application

#### a. *IAAC for failure to raise the Brady claim*

Because Smith's claim that his appellate counsel was ineffective for failing to raise a *Brady* claim on direct appeal was adjudicated on the merits in state court, this IAAC claim is subject to AEDPA deference if it is viewed as a freestanding claim for relief. *Joseph*, 469 F.3d at 459. But the IAAC claim is reviewed de novo if it is used to establish cause for procedural default so that the underlying claim can be reviewed on the merits. *Id.* Moreover, "establishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice." *Id.* at 462–63. Thus, if Smith's appellate counsel was constitutionally ineffective in failing to raise a *Brady* claim, this would provide both cause and prejudice permitting the *Brady* claim to be heard on the merits.

The standard for an IAAC claim "is that enunciated in *Strickland*." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). A petitioner must show that counsel's performance was "objectively unreasonable" and that there was "a reasonable probability that . . . he would have prevailed on his

---

exception to the requirement to "exhaust[] the remedies available in the courts of the State." *Id.* § 2254(b)(1)(A). But, though the two are sometimes confused, "[e]xhaustion and procedural default . . . are distinct concepts. . . . Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Williams*, 460 F.3d at 806 (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). This is because a "petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Coleman*, 501 U.S. at 732.

appeal" had counsel raised the unreasonably omitted issues. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687–91, 694 (1984)); *see also Mapes v. Tate*, 388 F.3d 187, 191 (6th Cir. 2004).

### *i. Performance*

We look to a number of factors in determining whether appellate counsel's performance was deficient, including but not limited to whether the omitted issues were "significant and obvious," whether there was "arguably contrary authority," whether the omitted issues were "clearly stronger than those presented," whether the omitted issues were preserved, and whether "the trial court's rulings [were] subject to deference on appeal." *Mapes*, 388 F.3d at 191.

Many, though not all, of these factors counsel in favor of finding that appellate counsel's failure to raise the *Brady* claim was objectively unreasonable. The *Brady* claim was both significant and obvious. It was preserved. And it was stronger than the arguments for reversal Smith raised on direct appeal—with the possible exception of his claim that his *sentence* was illegally long, for which he was afforded relief. Indeed, this claim was "clearly stronger" than the first point in his brief, which was that the trial court erred by relying on its own personal knowledge of locations and distances as well as in admitting evidence of Smith's prior bad acts. As the Ohio Court of Appeals pointed out, Smith failed to demonstrate any prejudice from the trial court's reliance on its own personal knowledge of the neighborhood and its admission of prior bad-acts evidence was harmless error. Yet, as to the *Brady* claim, even the trial judge admitted that a jury might find the suppressed lab notes persuasive. On the other hand, under Ohio law, the denial of a new trial motion is reviewed deferentially, for an abuse of discretion. *State v. Williams*, 330 N.E.2d 891, 894 (Ohio 1975).

Despite this deferential standard of review, because the *Brady* claim was Smith's strongest argument for reversal of his conviction and because the issue was raised and fully litigated in front of the trial court, it was objectively unreasonable for appellate counsel not to raise the *Brady* claim.

*ii. Prejudice*

Answering the question of whether there was "a reasonable probability" that Smith would have "prevailed on his appeal," *Smith*, 528 U.S. at 285, requires looking at merits of the underlying claim. After all, there can only be a reasonable probability that Smith would have prevailed on appeal had he raised the *Brady* claim if there is some merit to this claim. But, "[a]lthough this analysis necessarily involves an evaluation of the underlying claims, it does *not* require a decision on or a determination of these issues." *Mapes*, 388 F.3d at 194. Moreover, that a state court in fact rejected an IAAC claim brought under Rule 26(B) as meritless is not dispositive of this issue. *See Goff v. Bagley*, 601 F.3d 445, 466–67 (6th Cir. 2010) (holding that the Supreme Court of Ohio's conclusion that appellate counsel was not ineffective for failing to raise "an obviously winning claim" on direct appeal was "an unreasonable application of federal law").

As noted above, Smith's IAAC claim is reviewed de novo if it is being used to excuse procedural default; it is only subject to AEDPA deference when viewed as a freestanding claim for relief. *Joseph*, 469 F.3d at 459. For this reason, Smith does not need to show at this stage that the Ohio Court of Appeals' rejection of his IAAC claim for failing to raise the *Brady* issue on appeal was an "unreasonable application" of federal law. *See* 28 U.S.C. § 2254(d)(1).

*Brady* requires the prosecution to disclose impeachment and exculpatory evidence to the defense "where the evidence is material either to guilt or to punishment." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (quoting *Brady*, 373 U.S. at 87). "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469–70 (2009). Such "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). This is a relatively lax standard:

it "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* (citing *Bagley*, 473 U.S. at 682). Thus, this standard is far easier to meet than that of *Schlup*, which requires a petitioner to show it is more likely than not that *no* reasonable juror would have lacked a reasonable doubt. Moreover, the suppressed evidence "must be evaluated in the context of the entire record. . . . [I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 112–13 (1976).

Importantly, the test for materiality under *Brady* does not vary depending on whether the court hearing the *Brady* claim also presided over the bench trial. In *Bagley*, the Supreme Court articulated the exact same "reasonable probability" standard as in other cases involving *Brady* claims even though the motion came before the judge "who had presided at [the] bench trial." 473 U.S. at 672. And in *Strickland*, discussing this reasonable probability standard, the Court made clear that the "assessment of prejudice" does not "depend on the idiosyncrasies of the particular decisionmaker." 466 U.S. at 695; *see also id.* at 694 (noting that the standard for prejudice for ineffective assistance of counsel claims is derived from the standard for *Brady* claims). *Brady* requires courts to "ask whether 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different' for a generic factfinder who has not already reached a determination of guilt beyond a reasonable doubt." *United States v. Pasha*, 797 F.3d 1122, 1134 (D.C. Cir. 2015) (quoting *Bagley*, 473 U.S. at 682).

The trial court's comments at the end of the post-trial hearing, which provide the only explanation in the record for why it denied the new trial motion, suggest that it misconstrued *Brady*. The court told counsel, "you might have an argument if you're trying it to a jury, but you're trying the case to me, and I'm also deciding this motion for new trial. . . . I have no doubt that both these

guys were involved in this." The relevant question, however, was not whether the trial judge would have voted to convict regardless of the new evidence.[3] The question was instead whether there was a reasonable probability that a generic, reasonable factfinder would have had a reasonable doubt if she knew of the withheld DNA lab notes. To the extent that the court's comments can be taken as a statement of its reasons for denying the motion, it likely abused its discretion by misapprehending and misapplying Supreme Court precedent.

Further, viewed under the correct standard, there was a reasonable probability of a different outcome had the lab notes been disclosed to the defense. Although it was elicited at trial that Allen was included in the multi-source DNA sample derived from the wig while Smith was excluded, Dr. Heinig testified at the post-trial hearing that she needed the lab notes to understand these results because the report disclosed to the defense before trial did not allow her to determine whether Allen's DNA was found at every locus tested or just one or two loci. Only by reviewing the underlying lab notes was she able to determine that alleles matching Allen's DNA were present at almost every locus tested on the wig. Of course, this is not conclusive proof that Allen was wearing the wig during the robbery. As Dr. Heinig testified, DNA evidence does not indicate when someone wore or touched an item. Nor does the absence of Smith's DNA definitively prove that Smith never wore the wig. But the fact remains that "the heavy presence of Charles Allen's DNA . . . was consistent with Allen wearing [and] not just briefly touching the items."

This point is of crucial significance because it directly undermines the trial court's explanation of how the DNA evidence pointing to Allen was consistent with Smith's guilt. In rendering its verdict at the bench trial, the trial court stated that it was not concerned with Allen's

---

[3] We note that if the standard for *Brady* materiality in cases involving bench trials was whether there was a reasonable probability that the *trial judge* would have voted differently, a trial court's determination of whether suppressed evidence was material would be essentially unreviewable by appellate courts.

DNA being on the wig because "he was in the car, too, he touched it also." Such a theory that Allen's DNA was transferred to the wig by a brief touching may have been consistent with the evidence at trial, when it was unclear how much of Allen's DNA was on the wig, but it was not consistent with the lab notes disclosed after trial. The trial court implicitly recognized this problem when it changed its explanation for why Allen's DNA was found on the wig at the end of the post-trial hearing, speculating that Allen may have worn the wig while committing other robberies. The court posited, "it could very possibly be that Charles Allen wore this outfit and had this on numerous occasions on other robberies, or even that day wore it and gave to Chris to wear, *that's why he has a heavy presence of DNA on it*, and that would mask Chris Smith's DNA when he wore it." The problem with this explanation is that there was no evidence to support it at trial.

Nor was there any evidence at trial to support a theory that Smith was the driver, and thus liable as an accomplice, which would be another way of accounting for the strength of the DNA evidence pointing to Allen. Although accessories are as liable as the principal, both Moore and Allen identified Smith as the robber and Allen as the driver. Indeed, the State's theory of the case, from the indictment to its closings, was that Smith was the robber and Allen his accomplice. A properly instructed jury therefore could not find Smith guilty on an aiding-and-abetting theory. *Cf. Lucas v. O'Dea*, 179 F.3d 412, 416–17 (6th Cir. 1999) (holding that there was a "fatal variance" between the indictment and the jury instructions when the defendant was charged with shooting the victim, but the court instructed the jury that whether he fired the shot was "immaterial").

In a case with stronger evidence, the suppressed evidence might not be enough to create a reasonable probability of a different outcome. But, here, it is sufficient to "undermine[] confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). If a

reasonable factfinder knew that Allen's DNA was present at almost every locus tested on the wig, while Smith's DNA was not detected, there would be a reasonable probability of acquittal.

Because there is a reasonable probability that Smith's conviction would have been reversed had he raised the *Brady* claim, it was IAAC not to raise it on direct appeal. Smith can thus show cause and prejudice excusing the procedural default of his *Brady* claim. We will not consider the merits of the *Brady* claim, however, because the portion of the COA relating to the *Brady* claim is limited to the issue of whether the district court was correct not to consider the merits of this claim,[4] and Smith never moved to expand the COA. *See Harris v. Haeberlin*, 526 F.3d 903, 907 n.1 (6th Cir. 2008). Although we have the "inherent authority to expand *sua sponte* the scope of the COA to encompass additional issues briefed and addressed on the merits before the district court," *Howard v. United States*, 485 F. App'x 125, 127–28 (6th Cir. 2012), we decline to do so here when the merits issue was neither fully briefed nor addressed below.

We therefore remand Smith's *Brady* claim to the district court to consider on the merits. In so doing, the district court is first required to determine whether this claim was "adjudicated on the merits in [s]tate court proceedings." 28 U.S.C. § 2254(d). If it was, the district court must review the adjudication of this claim under the deferential standard required by AEDPA. *See id.*

### b.    IAAC for failure to raise judicial bias

In his first 26(B) application, Smith argued that counsel for his direct appeal had been ineffective for failing to raise judicial bias. Specifically, Smith argued that the trial judge's conduct during closing arguments demonstrated "favoritism toward one of the litigants" and showed that the trial judge had a "fixed anticipatory judgment" before defense counsel began closing argument.

---

[4] Specifically, the district court granted a COA "as to whether the Court was correct in finding a procedural default, whether the Court was correct in finding no excuse to the procedural default exists, and whether the Court was correct in not considering the merits" of the *Brady* claim.

In support, Smith noted that "[d]uring defense counsel's closing argument, the trial court interrupted [counsel] approximately 20 times. In almost every instance, the trial court's comment or question signaled that the court took issue with a statement of the defense, or indicated that the court agreed with the State's version of the events on October 17, 2007."

The Ohio Court of Appeals denied this claim. The court concluded that the judicial bias claim "would not have presented a reasonable probability of success, and . . . appellate counsel cannot be said to have been ineffective in failing to advance it" because, under Ohio law, an intermediate appeals court would not have had jurisdiction to rule on this claim. Smith appealed this denial to the Ohio Supreme Court, which declined jurisdiction. Smith thus properly presented the IAAC claim for failing to raise judicial bias to the Ohio courts, which decided the issue on the merits. So, if Smith's appellate counsel had been constitutionally ineffective for failing to raise the judicial bias claim, this would—like the analysis for the *Brady* claim above—provide both cause and prejudice to excuse the procedural default for the judicial bias claim, permitting it to be heard on the merits. *See Gunner*, 749 F.3d at 516; *Edwards*, 529 U.S. at 450–51.

Again, because this IAAC claim would only be used to establish cause for procedural default, we review this claim de novo. *Joseph*, 469 F.3d at 459. And again, to prevail, Smith would have to show that counsel's performance was both "objectively unreasonable" and that there was "a reasonable probability that . . . he would have prevailed on his appeal" had counsel raised the unreasonably omitted issues. *Smith*, 528 U.S. at 285; *see also Mapes*, 388 F.3d at 191.

Smith fails at the first prong. Even assuming that the Ohio Court of Appeals had jurisdiction to rule on this claim, appellate counsel's decision to forego it was not objectively unreasonable. As support for his claim of judicial bias, Smith cites *Tumey v. Ohio*, 273 U.S. 510, 525 (1927) and *Rose v. Clark*, 478 U.S. 570 (1986). But these do not supply "arguably contrary

authority" on the issue. *Mapes*, 388 F.3d at 191. *Tumey* dealt with a judge who had a "pecuniary" interest in the outcome of the trial. 273 U.S. at 514–15. Smith makes no such allegation as to his trial judge. *Rose* does not expand this meaning of bias; instead it only references *Tumey* as an example of a biased judge. 478 U.S. at 577–78. And while Smith argues that the trial judge had a "fixed anticipatory judgment," the evidence shows nothing more than a judge engaging with counsel on the evidence. There was thus no "significant and obvious" issue to raise on appeal. *Mapes*, 388 F.3d at 191. Nor was this claim "clearly stronger" than those presented. *Id.*

Because appellate counsel was not ineffective in failing to raise the judicial bias claim on direct appeal, there is no cause and prejudice to excuse the underlying procedural default. We thus affirm the district court's dismissal of claim four based on procedural default.

### D. The Freestanding IAAC Claim

Finally, there is the question of the merits of the part of Smith's seventh claim that is not procedurally defaulted—IAAC for failing to raise the *Brady* claim on direct appeal. As discussed above, this freestanding IAAC claim is subject to AEDPA deference. *Joseph*, 469 F.3d at 459.

Although the district court granted a COA on the issue of whether the habeas petition "states a valid claim for ineffective assistance of appellate counsel," Smith made only the most barebone of arguments for why he should prevail on this claim on the merits. He asserts on appeal that "[t]he district court ruled contrary to and unreasonably applied *Strickland* in deciding that . . . appellate counsel's failure to raise [the *Brady*] issue did not constitute IAAC." But the question is instead whether the Ohio Court of Appeals' adjudication of Smith's first Rule 26(B) application "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Because this issue was not adequately briefed before us and its analysis will

necessarily overlap with the analysis required for the *Brady* claim, we remand the IAAC claim for the district court to address in light of the above discussion.[5]

## CONCLUSION

For the foregoing reasons, claims two to six in Smith's § 2254 petition are procedurally defaulted and no excuse or bypass for this default exists. IAAC does excuse Smith's procedural default of his *Brady* claim, however, requiring the district court to reach the merits of this claim. We therefore **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

---

[5] It will likely make sense for the district court to first analyze the *Brady* claim on the merits. The proper remedy for a *Brady* claim would be the granting of a conditional writ of habeas corpus unless the State retries Smith. The proper remedy for a freestanding IAAC claim would be granting a writ of habeas corpus unless the State reopens the appeal. *Goff*, 601 F.3d at 472–73 (citing *Mapes*, 388 F.3d at 193–95).