# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 20, 2019   Decided March 6, 2020

No. 18-3056

UNITED STATES OF AMERICA,
APPELLEE

v.

STEVEN MASON, ALSO KNOWN AS SAM MASON,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cr-00195-2)

*Gregory S. Smith*, appointed by the court, argued the cause and filed the briefs for appellant.

*Daniel J. Lenerz*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: ROGERS, GRIFFITH, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: A jury convicted Steven Mason and a codefendant of conspiring to deal heroin and other drugs.

Mason was sentenced to five years' imprisonment, the statutory mandatory minimum. On appeal, Mason argues that the government violated its constitutional obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose material helpful to his defense in a timely manner. Mason also objects to the district court's refusal to grant him a trial separate from that of his codefendant. And he says the district court should have found him eligible for a reduction of his sentence under section 5C1.2 of the Sentencing Guidelines. We reject each of Mason's arguments and affirm his conviction and sentence.

I

Because Mason's arguments are highly fact-bound, we describe discovery, the trial, and sentencing in some detail.

A

In 2016, a federal grand jury indicted Mason, Andrea Miller, Nicholas Jones, Frank Walker, and several others for their participation in a drug conspiracy. The government alleged that Jones and Walker led a conspiracy that imported drugs into the United States, then sold them to middlemen. According to the government, Mason was one of the middlemen and Miller received a shipment of drugs at her home.

Although most of the conspirators pleaded guilty, Mason and Miller did not. The government filed a new two-count indictment against them in October 2017. The first count charged Miller with conspiracy to import heroin and Xanax. The second charged Mason and Miller with conspiracy to distribute heroin, Xanax, and fentanyl. Mason sought to separate his trial from Miller's, but the district court denied his motion and set their joint trial to begin in January 2018.

Problems arose in December 2017, when the government made a series of disclosures that suggested that Nicholas Jones, who was likely to appear as a key government witness, might lie at the trial. In early March 2017, the government learned of a rumor that a member of the conspiracy had written a letter reporting that he planned to tell lies about Walker's role and that Walker had a copy of the letter. The government suspected that Jones wrote the letter but he denied that he was the author when asked during a March 10 interview. In May, the government asked Jones about the letter again, this time with the aid of a polygraph. Although he denied authorship, the polygraph suggested he was lying.

In a June interview, the previously uncooperative Walker gave the government the handwritten letter, which described its author's plan to "go down there and lie on everybody." According to Walker, Robert Bethea, a fellow inmate whose nickname was "Jazz," told Walker in February that Jones had written the letter. Jazz gave the letter to Walker later that month.

Neither counsel for Mason nor Miller knew any of this until disclosed by the government on the eve of trial in December 2017. Displeased by this late disclosure, they moved for dismissal of the indictment, arguing that the government had violated its *Brady* obligation to timely disclose material helpful to them. Defense counsel also set out to find Jazz, whose testimony might link Jones to the letter undermining his credibility. They soon discovered, however, that Jazz had died of a drug overdose in April 2017, shortly after his release from jail.

Jazz's death limited the letter's value to the defense. So, too did the "conclusive" determination of the government's

handwriting expert that Jones did not write the letter, the district court's ruling that defense counsel could not refer to Jones's failed polygraph, and Walker's refusal to testify, invoking the protection of the Fifth Amendment.

The district court denied the *Brady* motion on the ground that Mason and Miller suffered no prejudice from the belated disclosure. The government "didn't have an opportunity to review the letter until June 2017, at which point Jazz had already died," the court found. "So the defense would not have had an ability to interview Jazz had the government disclosed this information in June when they should have." Tr. of Pretrial Hr'g (Jan. 29, 2018) at 31:22-32:1, J.A. 248-49. To allow the defense additional time to prepare, the court continued the trial for more than a month.

B

The seven-day jury trial against Mason and Miller began on February 26, 2018. The government presented its case against Miller first, with testimony that showed Miller had allowed Jones to ship drugs to her home. Before the government began its case against Mason, the court received the following note from Juror #1:

> Your Honor, would it be possible for the government to ask Mr. Jones, one, why did he or Mr. Walker choose Mr. Mason's house for drug delivery? And two, did he or Mr. Walker have a personal relationship with Mr. Mason or was this address picked at random?

Tr. of Jury Trial (Mar. 2, 2018) at 795:3-10, J.A. 874. The court acknowledged that the note was "concerning," as the government had never suggested that Mason's house was used for drug delivery. "[I]t seems to me that at least one juror is

confused and thinks that Mr. Mason lives at [Miller's address]. I don't know how." *Id.* at 794:12, 795:11-13, J.A. 873-74. The court instructed the jury that its "question may be resolved through the remainder of the evidence." If not, the court said, the jury should send another note "at the close of the evidence." *Id.* at 802:12-14, J.A. 881.

Shortly after the court's instruction, the government asked Jones whether he knew Mason's address. Jones answered no. *Id.* at 807:18-808:1, J.A. 886-87. Mason renewed his motion for severance, this time citing the juror note as evidence of prejudice, but the court denied the motion. No juror ever sent a follow-up note on the subject.

The government then presented its case against Mason, including testimony by Jones and wiretapped phone calls in which Mason and his coconspirators discussed dealing drugs. Concerned that Jones would deny authorship and that the government would bolster that denial with the testimony of its handwriting expert, defense counsel never used the letter at trial. The jury found Mason and Miller guilty of all charges other than those related to fentanyl, on which the court had granted a judgment of acquittal.

C

Before sentencing, Mason sought to qualify for the Sentencing Guidelines' "safety valve," which would allow him to avoid a five-year mandatory minimum sentence if he fully debriefed the government on his "offense of conviction and all relevant conduct." U.S.S.G. § 5C1.2 cmt. n.3. During the debriefing interview, Mason was asked about his associates in the drug trade. Mason refused to answer, saying he didn't want to "put someone else in the line of fire."

At sentencing, the government cited Mason's refusal to name his drug suppliers or customers as reason to find him ineligible for the safety valve. The district court agreed and sentenced Mason to five years' imprisonment.

This timely appeal of his conviction and sentence followed. The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

II

A

Mason argues that the government's belated disclosure of what it knew about the handwritten letter violated his constitutional rights under *Brady v. Maryland*. He asks that we vacate his conviction and direct the district court to dismiss the indictment or remand for a new trial. Because the relevant facts are uncontested, our review of Mason's *Brady* claim is de novo. *See United States v. Sitzmann*, 893 F.3d 811, 821 (D.C. Cir. 2018) (per curiam).

A *Brady* violation has three parts. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Information about the letter was favorable to Mason because it tended to impeach Jones, a government witness against him. The government suppressed its knowledge of the letter by postponing disclosure for months, until trial was imminent. *See United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015). At oral argument, the government declined to

"defend[] the timeliness" of its disclosure and conceded that it had "made a misjudgment as to the amount of time that the Defense needed" to use the information disclosed. Tr. of Oral Arg. at 25:12, 33:25-34:1. We agree. The government's delay was "inexcusable." *Pasha*, 797 F.3d at 1133.

But even a grossly belated disclosure does not violate *Brady* unless the defendant suffers prejudice from the delay. Prejudice exists only if there is "a reasonable probability that . . . the result of the proceeding would have been different" had the disclosure occurred earlier. *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "'probability' reaches the level of 'reasonable' when it is high enough to 'undermine confidence in the verdict.'" *United States v. Johnson*, 592 F.3d 164, 170 (D.C. Cir. 2010) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). "The defendant bears the burden of showing a reasonable probability of a different outcome." *United States v. Johnson*, 519 F.3d 478, 488 (D.C. Cir. 2008).

Mason asserts three forms of prejudice from the belated disclosure. First, he says, "earlier production of the letter would have kept defense counsel from being hamstrung by the time constraints that later arose in the waning weeks before trial." Mason Br. 35. That argument fails, because a continuance of reasonable length negates any prejudice arising from time constraints alone. *See, e.g.*, *United States v. Halloran*, 821 F.3d 321, 341-42 (2d Cir. 2016). The district court granted Mason such a continuance.

Mason next argues that an earlier disclosure of what the government knew about the letter might have provided defense counsel with promising leads. Perhaps, he says, defense counsel would have uncovered cellmates who overheard a conversation between Jazz and Jones about the letter had they

investigated the matter earlier in 2017. *See* Tr. of Oral Arg. at 40:7-8. Maybe Walker, had he been interviewed earlier, would have been willing to testify as to what Jazz told him about the letter, instead of pleading the Fifth. *See id.* at 6:12-7:17. Or defense counsel might "have subpoenaed . . . and monitored [Jazz] . . . so [that] he never died." *Id.* at 12:9-13.

Maybe so. But "mere speculation is not sufficient to sustain a *Brady* claim." *United States v. Horton*, 756 F.3d 569, 575 (8th Cir. 2014) (internal quotation marks and citations omitted). Hypothesizing that certain "information, had it been disclosed to the defense, might have led [defense] counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized" is disfavored. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (describing such reasoning as "mere speculation, in violation of the standards" the Supreme Court has established for *Brady* claims). The argument that an earlier disclosure might have led Mason to uncover other promising leads is simply too speculative to undermine our confidence in the outcome of the trial.

Last, Mason argues that with an earlier disclosure he could have "found and interviewed" Jazz, Mason Br. 35, who might have provided statements that were "admissible as impeachment evidence," Reply Br. 8. We can assume, for the sake of argument, that the government should have disclosed its knowledge of the rumored letter in March 2017, before Jazz's death in April. Even so, Mason fails to show that the defense he presented at trial differed in any meaningful way from the defense he could have presented if he had interviewed Jazz. If Mason's defense would have been the same regardless, he cannot meet his burden of showing a "reasonable probability of a different outcome" at trial, *Johnson*, 519 F.3d at 488, and his *Brady* claim fails.

Mason's principal obstacle is the rule against hearsay. *See* Gov't Br. 29. Even assuming that an earlier disclosure would have led to an interview with Jazz, and that such an interview would have provided grounds to impeach Jones, Mason fails to show how the out-of-court statements of a deceased declarant would have helped him at trial. Such statements would have been obvious hearsay if offered for the truth of the matter asserted—that Jones had written the letter—and inadmissible at trial unless subject to an enumerated hearsay exception. *See* FED. R. EVID. 801, 802; *see also* 30B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 6728 (2018 ed.).

Mason says that any of three hearsay exceptions would have allowed the court to admit Jazz's hypothetical statements: the exception for dying declarations, the exception for statements against interest, and the residual exception. *See* Reply Br. 8. We disagree. The exception for dying declarations does not apply because Jazz's statements would have had nothing to do with the "cause or circumstances" of his death. FED. R. EVID. 804(b)(2). The exception for statements against interest is unavailing as well. Mason offers no argument why statements naming Jones as the letter's author would have been "so contrary to [Jazz's] proprietary or pecuniary interest or had so great a tendency . . . to expose [Jazz] to civil or criminal liability," *id.* 804(b)(3)(A), that they should qualify under that exception.

The residual exception fares no better. We apply this "extremely narrow" exception "sparingly," "only in the most exceptional circumstances," and only if the out-of-court statement is both "very important and very reliable." *United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017) (per curiam) (internal quotation marks and citations omitted). We can grant that a statement by Jazz impeaching Jones might have

been "very important" to Mason's defense, but it would have been of doubtful reliability. Mason argues that the requisite "indicia of reliability" would come from the statements of others that Jazz had told them Jones wrote the letter. Tr. of Oral Arg. at 12:16-24; 39:18-23. But we doubt that more hearsay from Jazz would provide the "sufficient guarantees of trustworthiness" the residual exception requires. FED. R. EVID. 807(a)(1). And in any event, the government could undermine any showing of reliability with the handwriting expert's "conclusive" determination that Jones didn't write the letter.[*]

Of course, defense counsel might have relied on Jazz's statements to question Jones during cross-examination. *See, e.g.*, *United States v. Whitmore*, 359 F.3d 609, 621-22 (D.C. Cir. 2004). But we doubt such a tack would have been effective here. Defense counsel could have cross-examined Jones using their knowledge of the letter, but they declined. Moreover, the use of additional statements from Jazz to impeach Jones was unlikely to have improved the cross much, as Jones could deny authorship all the same. And defense counsel feared the government would bolster that denial with its "conclusive" handwriting analysis. *See* Mason Br. 12, 36. Given the circumstances of this case, we see no "reasonable probability of a different outcome," *Johnson*, 519 F.3d at 488, from such an exchange.

We hold that Mason has failed to demonstrate prejudice from the government's belated disclosure and that his *Brady*

---

[*] In the alternative, Mason argues that even if the interview yielded no admissible evidence it might have revealed the identity of Jazz's "uncle," a "potential additional (living) witness to these matters" who was mentioned, but never named, in the handwritten letter. Reply Br. 8-9. Again, the possibility that additional information about an unknown person might have helped Mason's defense is simply too speculative to undermine our confidence in the verdict.

claim thus fails. That holding is consistent with our decision in *United States v. Pasha*, 797 F.3d 1122 (D.C. Cir. 2015), in which the government waited eight months to disclose that an eyewitness had made statements favorable to the defense. By the time defense counsel interviewed the eyewitness, he said his memory had faded; he was no longer useful to the defense. We held that one of the defendants, against whom the evidence was particularly weak, was prejudiced by the belated disclosure and thus had a valid *Brady* claim.

*Pasha* differs from Mason's case. For one, the defendant in *Pasha* demonstrated how an earlier interview with the eyewitness would have helped her. Had she taken "a sworn statement from [the eyewitness] when his memory was fresh," at trial the eyewitness might have read that statement into evidence as a recorded recollection. Reply Brief for Appellant Daaiyah Pasha at 20, *Pasha*, 797 F.3d 1122 (No. 13-3024), 2015 WL 831935; FED. R. EVID. 803(5). That option was unavailable to Mason because Jazz could not testify under any circumstances. Further, the government's case against the defendant who prevailed on her *Brady* claim in *Pasha* was not strong. *See* 797 F.3d at 1137 (describing the "weak evidence" that the defendant participated in the crime). Mason's incriminating wiretapped statements, through which the jury heard Mason himself make several thinly veiled references to dealing drugs, distinguish this case from *Pasha*. *See* Mason Br. 22 (acknowledging that these wiretaps were "obviously the Government's strongest evidence against" him).

B

Mason objects to the district court's denial of his motions for misjoinder and severance. The purpose of both motions is the same: to separate a defendant's trial from his codefendant's. Because severance, unlike misjoinder, can require a court to

consider events that occurred at trial, we review the denial of a severance motion for abuse of discretion and the denial of a misjoinder motion de novo. *See United States v. Bikundi*, 926 F.3d 761, 781 (D.C. Cir. 2019) (per curiam); *United States v. Bostick*, 791 F.3d 127, 145 (D.C. Cir. 2015).

1

In his pretrial motion for misjoinder, Mason argued that the indictment improperly joined his trial with that of his codefendant Andrea Miller. He and Miller "were merely two small spokes in a larger drug conspiracy," he says, who did not conspire "together" at all. Mason Br. 38.

We have a "broad policy favoring initial joinder." *United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984). Under Federal Rule of Criminal Procedure 8(b), an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Our Rule 8 "[j]oinder analysis 'does *not* take into account the evidence presented at trial,' but rather 'focuses solely on the indictment and pre-trial submissions.'" *Bostick*, 791 F.3d at 145 (quoting *United States v. Gooch*, 665 F.3d 1318, 1334 (D.C. Cir. 2012)).

The indictment's allegation that Mason and Miller conspired to distribute drugs made joinder of their trials proper. "The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an offense." *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir. 1988) (quoting *United States v. Castellano*, 610 F. Supp. 1359, 1396 (S.D.N.Y. 1985)). We have frequently held that participation in the same charged conspiracy justifies

joinder. *See, e.g.*, *United States v. McGill*, 815 F.3d 846, 905 (D.C. Cir. 2016); *United States v. Spriggs*, 102 F.3d 1245, 1255-56 (D.C. Cir. 1996).

We reject Mason's argument that the indictment falsely alleged that he and Miller conspired "together." The allegation that the two "did knowingly and willfully combine, conspire, confederate and agree together" and with others to distribute heroin and other drugs, Indictment (Oct. 17, 2017) at 2, J.A. 24, is nothing more than an allegation that Mason and Miller participated in the same conspiracy, which they did. We also reject Mason's argument that "the prosecution's own statements made at trial later plainly revealed" that Mason and Miller's "'acts and transactions' did not overlap at all." Mason Br. 39. "If the indictment establishes proper joinder under Rule 8(b), trial evidence cannot render joinder impermissible and is thus irrelevant to our inquiry." *United States v. Moore*, 651 F.3d 30, 69 (D.C. Cir. 2011) (per curiam), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013).

2

Under Federal Rule of Criminal Procedure 14(a), a district court may sever codefendants' trials if joinder "appears to prejudice a defendant." Mason says severance was required for two reasons: the "generalized prejudice" he faced from a joint trial with Miller and the "specific prejudice" that arose from the "confusion" demonstrated by the note from Juror #1. Mason Br. 40.

We disagree. We recognize that in some joint trials, the risk of prejudice to one coconspirator is so great that Rule 14(a) requires severance even where joinder was proper. For instance, severance may be appropriate when coconspirators are accused of "grossly disparate crimes," *United States v.*

*Sampol*, 636 F.2d 621, 645 (D.C. Cir. 1980) (per curiam), or when there is great "disproportion in the evidence," *United States v. Mardian*, 546 F.2d 973, 980 (D.C. Cir. 1976) (en banc).

This is not one of those cases. Mason and Miller were jointly charged with conspiracy to distribute drugs. Miller alone was charged with conspiracy to import drugs. Those are not grossly disparate crimes. *See Sampol*, 636 F.2d at 647 (requiring severance where defendant was accused of making false declarations and misprision of felony and codefendants were accused of "crimes of conspiracy to assassinate and murder"). Nor was there such disproportion in the evidence that severance was warranted. The government presented evidence of international drug trafficking during its case against Miller. But much of the same might have been introduced at a trial against Mason alone to prove he had conspired to distribute a significant quantity of heroin. *See McGill*, 815 F.3d at 947; *United States v. Law*, 528 F.3d 888, 906 (D.C. Cir. 2008).

Nor did the district court abuse its discretion in denying Mason's motion for severance after it received the juror note. Over the course of the trial, the district court and the government took appropriate steps to make sure that the confusion revealed in the note was addressed. The government presented its cases against Miller and Mason separately. After receiving the note, the district court issued an appropriate instruction and the government promptly elicited testimony to dispel the juror's confusion. At the close of the trial, the district court instructed the jury that it was required to consider the evidence separately against each defendant. *See* Tr. of Jury Trial (Mar. 6, 2018) at 1326:1-5, 1336:5-14, J.A. 1405, 1415. Those steps sufficed to dispel any confusion about the different roles of Mason and Miller in the conspiracy.

Mason argues that "there can be no assurance that the spillover prejudice that we clearly *know* Juror #1 harbored . . . was in fact later purged" and that "[n]othing whatsoever reveals that Juror #1 did not vote to convict based at least in part on this mistaken understanding of the evidence." Mason Br. 42. That may be true. But Mason misunderstands the scope of our review. We do not ask whether we are certain no juror voted to convict based on a mistaken understanding of the evidence, a fact neither we nor the district court could know. We ask only whether the district court abused its discretion in denying his motions for severance. It did not.

C

Last, Mason challenges the district court's finding that he is ineligible for the safety valve provision of the Sentencing Guidelines. Under that provision, certain defendants who "truthfully provide[] to the Government all information and evidence" they possess concerning their "offense of conviction and all relevant conduct" may be sentenced without regard to a mandatory minimum. U.S.S.G. § 5C1.2(a)(5) & cmt. n.3. At sentencing, the government objected to Mason's refusal to name his other drug suppliers and the customers who purchased drugs from him. Mason argues the government and the district court expected him to provide more information than the safety valve requires. Because the breadth of the safety valve is a legal, not factual, question, we review the district court's finding de novo. *See United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) (per curiam).

As part of his blanket refusal to "put someone else in the line of fire," Mason refused to name the persons to whom he sold the drugs he obtained from Jones and Walker. According to the government, those customers would have been "significant mid-level dealers, purchasing 20 to 50 grams of

heroin, worth thousands of dollars, at a time." Gov't Br. 61. Their names constituted "information" concerning "the offense of conviction and all relevant conduct" that Mason was obligated to provide. *See United States v. Wrenn*, 66 F.3d 1, 3 (1st Cir. 1995) (affirming a finding of safety valve ineligibility for a drug-dealing defendant who refused to name his customers). Refusing to disclose the names of his customers disqualified Mason from taking advantage of the safety valve.

## III

For the foregoing reasons, we affirm Mason's conviction and sentence.

*So ordered.*